*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0038p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

REGINALD BROOKS,

       *Petitioner-Appellant,*

    *v.*

MARGARET BAGLEY, Warden,

       *Respondent-Appellee.*

No. 05-4461

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-02461—Donald C. Nugent, District Judge.

Argued: December 4, 2007

Decided and Filed: January 22, 2008

Before: SUTTON, McKEAGUE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael J. Benza, LAW OFFICES, Cleveland, Ohio, for Appellant. Thomas E. Madden, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, LAW OFFICES, Cleveland, Ohio, Alan C. Rossman, Cleveland, Ohio, for Appellant. Thomas E. Madden, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. This case arises from an act of filicide, in truth three acts of filicide, for Reginald Brooks murdered not just one of his sons but all three of them as they lay sleeping. Outside of Greek myth and the more fortunate sons of Cronus, this is not something we want to read about or indeed frequently ever hear about. This father, no surprise, suffered from a serious psychological illness and engaged in several odd forms of behavior during the years before the murders, information that the sentencing court was told and that it accepted. The court also was told that Brooks knew what he was doing on the morning of the murders, that he evaded responsibility for the crimes and that he had the capacity to appreciate what he did was wrong.

As is often true in the most appalling murder cases, the facts of the crime themselves add weight to both sides of the life-versus-death scales. The planned act of murdering one's three children confirms the utter depravity of the crime at the same time it suggests the seriousness of the

defendant's psychological illness. In the end, the sentencing court found that the aggravating factors outweighed the mitigating factors and imposed three capital sentences on Brooks.

The debate today is whether Brooks' trial counsel provided ineffective assistance during the penalty phase of the trial by failing adequately to investigate his mental-health history and background. In support of this theory, Brooks principally offered three pieces of new evidence that his three lawyers, one investigator, one psychiatrist and one psychologist apparently did not discover and that they did not introduce during the mitigation hearing—namely that, during the two or so years before the murders, Brooks had practiced voodoo, accused his wife of having an incestuous relationship with their oldest son and refused to allow the same son to display his athletic trophies. The state courts rejected this claim in part because the sentencing court already had ample evidence of Brooks' serious psychological illness and other manifestations of that illness in front of it. The district court rejected his federal habeas claim as well. Because the state courts' resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, we affirm.

I.

On Saturday morning, March 6, 1982, Beverly Brooks left her home in Cleveland, Ohio, to go to work, leaving behind her three sons (17, 15, 11), who were still asleep, and her husband, Reginald, who was awake and upon whom she had served divorce papers two days earlier. At roughly 8:00 a.m., after Beverly had left the house, Reginald shot each of his sons in the head while they were asleep in their beds.

By the time Beverly returned home from work that day and discovered her dead children, Brooks had boarded a bus to Las Vegas, Nevada. On March 8, after tracing the credit card Brooks had used to purchase his bus ticket, police took him into custody in Utah. Although Brooks told the police he was carrying just one piece of luggage, a search of his wallet produced a baggage-claim check for a second suitcase. Inside that suitcase were Brooks' personal items and a box containing a fully loaded .38 special revolver and ammunition. Fingerprints on the gun box and two cartridges matched Brooks' fingerprints, and ballistics testing showed that the only two slugs that could be recovered from the victims were fired from the same .38 special. Authorities traced the gun to one that Brooks had purchased on February 25, 1982, and found gun-powder nitrate on the right sleeve of Brooks' coat.

On March 10, 1982, a grand jury indicted Brooks on three counts of aggravated murder. Brooks pleaded not guilty, after which the trial court referred him for a pre-trial competency hearing. Following a hearing at which a court-appointed psychiatrist, Dr. Aaron Billowitz, testified that Brooks suffered from schizophrenia, the court found Brooks "competent to stand trial," reasoning that he has the "ability to understand the charge against him and work and cooperate with his attorneys in his defense."

Brooks waived his right to a jury trial and, as permitted under Ohio law, proceeded to trial before a three-judge panel. During the guilt phase of the trial, Brooks prohibited his lawyers from presenting an opening or closing statement, putting on any witnesses or cross-examining certain witnesses. On September 23, 1983, the three-judge panel found Brooks guilty of the aggravated murders of his sons and referred him for a presentence investigation and psychiatric evaluation.

At the sentencing hearing on November 29–30, 1983, Brooks presented three witnesses: Dr. Stanley Althof, Dr. Kurt Bertschinger and Paul Hrisko. Althof, the chief psychologist at the Cuyahoga County Court Psychiatric Clinic, testified that Brooks suffered from paranoid schizophrenia, which "impair[s] a person," "reduce[s] his judgment, . . . reduce[s] his control, and likely did contribute to the commission of some crime." Bertschinger testified that Brooks suffered

from psychogenic amnesia, which prevented him from having "conscious recall of the alleged criminal activities in which he was involved." Because Brooks' amnesia prohibited Bertschinger from "obtain[ing] from [Brooks] anything about the incident, and [because there was] absolutely no collateral information [concerning Brooks' mental state at the time of the murders]," Bertschinger could "make no opinion as to mitigating circumstances." Hrisko, one of the three attorneys who represented Brooks during the guilt and penalty phases of the trial, indicated that Brooks refused to testify at both phases of the trial and that Brooks refused to submit to a sodium-amytal test, which psychiatrists use with trauma survivors to access repressed or unconscious material.

The State presented three witnesses at sentencing: James Hughey, Brooks' wife, Beverly, and Billowitz. Trying to show that Brooks understood psychology and had contrived his amnesia to appear incompetent, the State called Hughey (a Cleveland police officer) and Beverly Brooks to testify that, in the early 1970s, Brooks had taken college-level psychology courses and that psychology-related books were recovered from Brooks' residence after the murders. The State called Billowitz, a psychiatrist who evaluated Brooks on four occasions and who submitted multiple reports to the court, to testify that Brooks "was legally sane at the time of the act." Billowitz conceded on cross-examination that Brooks "was schizophrenic at the time of this act" and "may have experienced paranoid delusions" at that time, but nonetheless concluded that Brooks "maintained the capacity to appreciate that killing was wrong and . . . had the capacity to conform his conduct to the requirements of the law (as indicated by the great amount of circumstantial evidence showing detailed planning and awareness of escaping detection[)]."

On November 30, the three-judge panel sentenced Brooks to death for each of the murders. In its written opinion, the panel recognized that Brooks "suffered from a mental illness—schizophrenia"—"before, during, and after commission of the [murders]," but concluded that the "mental illness or defect did not cause him to lack substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law." The panel also acknowledged that Brooks' "family relationship [had] steadily deteriorated" since 1976 and that "[i]t [was] entirely conceivable that [Brooks] was under extreme stress due to [this] deteriorated relationship[,] . . . [his] lack of employment, and [the] threat of divorce"—including being served with divorce papers two days before the murders—but found that Brooks' "free will was not impaired by" these events or his mental illness. Brooks, the court stated, "in a single course of conduct, with prior calculation and design, chose to take a gun to the heads of his three sons and execute them through a twisted sense of jealousy, hatred, or despair. He had the ability to refrain from commission of those heinous acts." In reaching this conclusion, the panel "rejected [Brooks'] claim of psychogenic amnesia," reasoning that he had amnesia "only about those things that were incriminating, remembering things that were not incriminating, even though the incriminating and non-incriminating incidents or facts occurred at exactly the same time or close together in time. . . . [H]is denials were lies, not memory lapses, and . . . he clearly was not a victim of psychogenic amnesia." The court in the end "conclude[d] beyond a reasonable doubt that the aggravating circumstances outweigh all of the mitigating factors."

Brooks appealed, arguing (1) that his counsel provided ineffective assistance during the competency phase of the trial, (2) that the trial court erred in finding that the aggravating circumstances outweighed the mitigating factors and (3) that Ohio's death-penalty scheme was unconstitutional. The state courts rejected all three arguments and affirmed his conviction and sentence. *See State v. Brooks*, No. 48914, 1985 WL 8589 (Ohio Ct. App. Aug. 15, 1985); *Ohio v. Brooks*, 495 N.E.2d 407, 410 (Ohio 1986) (per curiam). The U.S. Supreme Court denied review. *Brooks v. Ohio*, 479 U.S. 1101 (1987).

In 1987, Brooks filed a petition for post-conviction relief in state court. Among other claims, Brooks contended that he had received ineffective assistance of counsel during the mitigation phase of the trial because his lawyers "fail[ed] to adequately conduct a mitigation investigation" and thus

precluded his mental-health experts from receiving "valuable" information concerning his mental-health history. In support, Brooks submitted affidavits from family members, friends, mental-health experts, attorneys and prison officials. Those affidavits said that Brooks' counsel had not contacted certain family members and friends of Brooks and that those family members and friends, if contacted, would have told Brooks' counsel additional information about his mental-health history.

Ten years later, the trial court rejected all of Brooks' claims. It concluded that Brooks' ineffective-assistance arguments "are without merit legally or factually and not supported by sufficient evidence through affidavits to require a hearing in this matter." Nothing in the record explains why it took ten years for the court to decide this case. The court of appeals affirmed, *see State v. Brooks*, No. 73729, 1999 WL 401655, at *9 (Ohio Ct. App. June 17, 1999), and the state supreme court denied review, *see State v. Brooks*, 724 N.E.2d 809 (Ohio 2000).

On April 17, 2002, Brooks filed a petition for a writ of habeas corpus in federal court, raising 20 claims for relief. In his ninth claim, Brooks argued that he was denied the effective assistance of counsel during the mitigation phase of his trial. The district court held that the claim was procedurally defaulted and rejected it on the merits as well. The court rejected Brooks' other 19 claims and denied Brooks a certificate of appealability on any of his claims. We issued a certificate of appealability for three related ineffective-assistance claims arising from the mitigation phase of the trial: "(1) whether trial counsel rendered ineffective assistance for failing to provide requested information to the retained mental health experts; (2) whether trial counsel rendered ineffective assistance for failing to investigate Brooks's background and personal history; and (3) whether trial counsel rendered ineffective assistance for failing to present mitigating evidence other than that addressing [Brooks'] competency."

## II.

## A.

Because Brooks filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), that statute potentially governs this case. We say "potentially" because AEDPA deference applies only "with respect to any claim that was *adjudicated on the merits* in State court proceedings." 28 U.S.C. § 2254(d) (emphasis added). And in this case the Ohio Court of Appeals seemed to reject Brooks' ineffective-assistance claim on alternative grounds, one of which was on the merits, the other of which was not (the procedural-bar ruling).

Because we doubt the soundness of the state court's procedural-bar ruling (and indeed whether it even enforced a procedural bar), we must consider whether the court's alternative merits ruling receives AEDPA deference. We think that it does. The language of the statute does not draw a distinction between cases involving alternative rulings; it refers broadly to "any claim that was adjudicated on the merits in State court proceedings." *Id.* While the state court of appeals need not have addressed the claim on the merits once it identified a procedural bar, it surely had the authority to do so as an additional ground for decision—making this additional ground no less a "claim that was adjudicated on the merits in State court proceedings" than if the case had not presented a procedural-bar issue at all. In this respect, we see no material difference between this type of alternative ruling and another one—where a state court offers alternative *merits* grounds for rejecting a claim. Here, for example, the state court ruled that Brooks failed to satisfy the deficient-performance and prejudice prongs of an ineffective-assistance claim, even though it need only have determined that Brooks failed to satisfy just one of these prongs to resolve the claim. Yet it would be strange to say that just one of these contentions was resolved on the merits or, worse, that neither one was. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (applying AEDPA deference to those prongs of *Strickland* that the state courts "reached").

This interpretation, moreover, would seem to favor judicial practices that in the main will benefit both sides in criminal cases. It is the rare criminal defendant who would prefer that the state courts *not* reach the merits of his constitutional claim. And it is the rare State that would object to a state court ruling that offers an additional ground for denying the defendant relief. Above all, this practice will "show a prisoner . . . that it was not merely a procedural technicality that precluded him from obtaining relief." *Carey v. Saffold*, 536 U.S. 214, 226 (2002). Just as a state court wishing to invoke an independent and adequate state ground to dispose of a case "need not fear reaching the merits of a federal claim in an alternative holding," *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (emphasis omitted); *see also White v. Schotten*, 201 F.3d 743, 750–51 (6th Cir. 2000), *overruled on other grounds by Lopez v. Wilson*, 426 F.3d 339 (6th Cir. 2005) (en banc), so it need not fear losing the benefit of the doubt that AEDPA gives to state court rulings whenever it invokes an independent and adequate state ground as an alternative holding.

We have some company in taking this approach. All of the circuit courts that have considered the question to our knowledge have determined, albeit with little discussion, that an alternative procedural-bar ruling does not alter the applicability of AEDPA. *See Zarvela v. Artuz*, 364 F.3d 415, 417 (2d Cir. 2004); *Busby v. Dretke*, 359 F.3d 708, 721 n.14 (5th Cir. 2004); *Johnson v. McKune*, 288 F.3d 1187, 1192 (10th Cir. 2002); *Bacon v. Lee*, 225 F.3d 470, 478 (4th Cir. 2000); *cf. Massachusetts v. United States*, 333 U.S. 611, 623 (1948); *United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 486 (1924).

We therefore must review Brooks' claims based on the deferential requirements of AEDPA. That means we may grant Brooks' application for habeas relief only if the state court's adjudication of his claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

B.

Brooks does not contend that the state appellate court's decision was "contrary to" clearly established Supreme Court precedent. And with good reason: that decision "correctly identifie[d] *Strickland* as the controlling legal authority" and thus was "not 'mutually opposed' to *Strickland* itself." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). He instead contends that the decision unreasonably applied *Strickland*. *See id.* at 411–12.

To establish ineffective assistance, a claimant must show that the attorney's performance was "deficient" and that this performance "prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Deficient performance occurs when the representation falls "below an objective standard of reasonableness." *Id.* at 688. Prejudice occurs when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The question in this case is not whether Brooks' three attorneys had a duty to conduct an adequate investigation into his mental-health history and to provide his experts with the information they needed to present an effective defense. They clearly did. *See id.* at 691; *Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995). The question rather is whether counsel satisfied that duty and, if they did not, whether that failing prejudiced Brooks' defense.

In support of his deficient-performance and prejudice arguments, Brooks presented several affidavits to the state courts in his post-conviction papers. In rejecting his claim, the state court of appeals offered the following reasons, among others:

> [T]he information in the affidavits submitted by him in support of his [post-conviction petition] was not sufficient to warrant relief or an evidentiary hearing.

The information is similar to that rejected in other cases denying [petitions] raising claims of ineffective assistance in litigating a capital defendant's mental status. New information that provides only additional detail to that presented at trial or that is simply cumulative or alternative to that presented at trial does not provide grounds for relief.

*Brooks*, 1999 WL 401655, at *6 (internal quotation marks and citations omitted). We will consider each of these affidavits in turn.

*Affidavit of Tyrone Brooks.* The affidavit of Brooks' brother, Tyrone, says that defense counsel did not contact him and that, if they had, he would have told them that he suffered from schizophrenia. The record casts considerable doubt on the premise of this claim—that counsel never spoke to Tyrone or that they never otherwise learned this information. The itemized statement of Mark Angelotta, Brooks' investigator, who worked at the direction of Brooks' attorneys, indicates that he met with Tyrone on three separate occasions—once before the guilt phase and twice between the guilt and penalty phases—and that Brooks' counsel attended the last meeting. Angelotta's notes refer to Tyrone's mental illness, indicating that "Tyrone has been in mental hospitals" for paranoid schizophrenia or depression.

But even if this affidavit could be construed to support a deficient-performance claim, it does not establish prejudice. The sentencing court was well aware that Reginald Brooks suffered from schizophrenia—indeed, no one disputed the fact—and the additional evidence that another family member suffered from the disease is the kind of cumulative evidence that does not show prejudice. *See Durr v. Mitchell*, 487 F.3d 423, 436 (6th Cir. 2007).

*Affidavit of Beverly Brooks.* The affidavit of Brooks' wife, who was a witness *against* Brooks at the trial, focuses on Brooks' increasingly strange patterns of behavior. In 1976, Brooks quit his job because he thought his co-workers were trying to poison him. And in 1979 and 1980, Brooks (1) became isolated and rarely left his home or visited with family members, (2) accused Beverly of trying to poison him, (3) "mutilated a child's doll by a cutting a hole in the doll's chest" and "hang[ed] [the doll] by its neck from a chandelier," (4) tore the telephone off the wall, (5) believed "in voodoo and the occult" and thought that "magic spells" could be placed on people, (6) destroyed his record albums and mutilated a wall ornament of a cat "by scratching out the eyes of the [cat]" and (7) "struck [Beverly] with his hands" for the second time in their marriage. What is more, "[d]uring the latter years of [the] marriage, [Brooks] accused [her] of having incestuous relations with [the couple's oldest son]," and Brooks was jealous of their oldest son's athletic abilities and refused to allow his son to display his trophies in the house. Beverly indicated that she would have divulged these facts to "defense counsel for use in the mitigation phase" but was not contacted "by defense counsel at or prior to either the guilt or mitigation phase of [Brooks'] trial."

The records of Brooks' investigator also cast doubt on the allegation that Beverly and the trial team did not communicate. They show that he had a two-hour conference with Beverly Brooks, Tyrone Brooks and one of Brooks' attorneys on October 25, 1983, over a month before Bertschinger issued his report and a month before the sentencing hearing. They also show that he interviewed Beverly, and his itemized statement shows that he met or talked with all three of Brooks' attorneys on the same day as the interview. Bertschinger, Brooks' primary expert during the mitigation hearing, testified that he "called Ms. Brooks, the defendant's ex-wife, and spoke with her for approximately half an hour getting some background information and some of her observations, particularly as they pertained to Mr. Brook[s'] behavior just prior to the alleged incident." Bertschinger pointed to specific comments that Beverly made to him concerning Brooks' behavior on the day of, and the years preceding, the murders.

All of this suggests that Brooks' counsel either spoke to Beverly or at least learned what she had to say through their investigator. But even if, despite this evidence, it could be said that her affidavit establishes deficient performance, it does not show prejudice. If the thrust of the affidavit is that *counsel* did not talk to Beverly about Brooks' history, that does not show prejudice if counsel's investigator spoke to Beverly (and no one claims that Brooks' attorneys failed to talk to their investigator) and if counsel's chief expert, Bertschinger, spoke directly to Beverly about the "background information and some of her observations, particularly as they pertained to Mr. Brook[s'] behavior just prior to the alleged incident."

Not only did Bertschinger speak to Beverly about Brooks' background and the events leading up to the murders, but he also testified about most of the pieces of information mentioned in Beverly's affidavit anyway. Bertschinger testified that, beginning around 1977, Brooks "quit working," "develop[ed] some suspicions regarding people at work," "withdr[e]w from contacts with friends, and to some degree . . . with family," had "paranoid ideation[s]," "thought people were trying to poison his food," "accused [Beverly] of trying to poison his food" and "had an idea at one point in time that his phone was being tapped." Billowitz discussed some of the same background information in his report and testimony, *see, e.g.*, JA 564 (explaining that Brooks had "significant difficulties in functioning" in the "last 5 years" and "appears to have become socially isolated" and "aggressive . . . at home"), as did the sentencing panel in its opinion, *see, e.g.*, JA 552 ("After the defendant Brooks quit working, their family relationship steadily deteriorated. At times, he was physically abusive toward his wife and children.").

That leaves three topics Beverly mentioned in her affidavit that did not come out at trial—(1) Brooks' belief in voodoo, his mutilation of dolls and his destruction of albums and a wall ornament; (2) Brooks' accusation that Beverly was having an incestuous relationship with the couple's oldest son; and (3) Brooks' refusal to allow his oldest son to display athletic trophies. These items were cumulative of the information already provided and, no less importantly, none of Brooks' post-conviction experts explains why *these* additional items by themselves would have changed the diagnoses.

In this regard, this case is similar to *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005). In *Hill*, the petitioner argued that post-conviction affidavits submitted by a psychiatrist and by a psychologist established prejudice under *Strickland* because they "demonstrate[d] how a properly prepared expert could have (and should have) testified." *Id.* at 316. We rejected that argument—under a de novo standard of review no less, *see id.* at 314—because, although the affidavits "provide[d] more information about [the petitioner's] background" than was presented at trial, the petitioner "fail[ed] to explain why this additional information would have been likely to persuade a jury to give him a life rather than a capital sentence and why at any rate its absence from [trial] testimony affected the jury's deliberations given that much of this background information was in the . . . psychological reports presented to the jury," *id.* at 317. "[I]n order to establish prejudice," we noted, "the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Id.* at 319. Yet there, as is true here, the information in the affidavits simply "echoed points" already presented to, and weighed by, the sentencer. *Id.* at 318; *see also Clark v. Mitchell*, 425 F.3d 270, 287 (6th Cir. 2005); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001).

Keep in mind, moreover, the context in which this information was sought. Brooks refused to allow his counsel to call Beverly as a witness at the guilt phase and apparently took the same view at the penalty phase of the trial, and he instructed counsel that they were "to in no way cross-examine [Beverly] as to the substantive facts that she might put forth." The point of any interviews with Beverly thus was not, quite improbably, to consider using her as a witness on Brooks' behalf or to establish a basis for cross-examining her when she testified for the State during the mitigation phase; it was to obtain additional background information for the experts. Yet with the information the

experts did possess, a diagnosis of schizophrenia was made, and the trial panel accepted that diagnosis.

*Affidavit of Franklin Hickman.* Filed by one of Brooks' penalty-phase attorneys, this affidavit says that Hickman was not provided with information concerning Brooks "[o]ther than the information contained in the psychological and psychiatric reports" and that he was not aware of, among other things, "Brooks' belief that he was being poisoned at work" or "the fact that prior to 1982 Brooks' brother Tyrone was hospitalized for treatment of schizophrenia." Like Beverly's and Tyrone's affidavits, Hickman's affidavit runs into contrary record evidence. Angelotta's itemized statement indicates that he met or talked with Hickman on four occasions—for a total of five hours—including once with Tyrone and Beverly Brooks and once on the day before the start of the sentencing hearing. But we again need not resolve whether the allegations are true or whether they show deficient performance; they do not show prejudice.

Hickman himself managed to obtain some of this same information through his questioning at trial. Bertschinger testified that Brooks "develop[ed] some suspicions regarding people at work" and "thought people were trying to poison his food." More importantly, as we have shown, most of this information came out during the mitigation hearing anyway, and the additional items Hickman mentions were cumulative of the mitigation theory already before the court.

Nor, critically, does Hickman's affidavit say anything about the extent of the investigations performed by Brooks' two other attorneys—the attorneys who handled the guilt phase of the trial, who brought Hickman into the case to assist them with the penalty phase of the trial and who presented part of the defense's case during the penalty phase—or anything about the extent of Angelotta's investigations. Having failed to present any affidavits from these other attorneys or from Angelotta to support his claims, Brooks is in no position to show that, whatever restrictions Hickman faced, they prejudiced Brooks' defense. Indeed, in view of the absence of affidavits from Brooks' other attorneys, there is no basis for concluding that they did not discover *all* of the allegedly new information and simply chose not to use it as a matter of strategy. *See Carter v. Mitchell*, 443 F.3d 517, 531 (6th Cir. 2006) ("[C]uriously absent from the record is any statement from trial counsel describing what he did or did not do in investigating [the defendant's] background. By not detailing trial counsel's efforts to learn of [his] background, [the defendant] has provided no basis for a finding that trial counsel's investigation was unreasonable.").

*Affidavit of Bertschinger.* Bertschinger, Brooks' primary mitigation expert, said that defense counsel did not provide him with information about Brooks' mental-health history, which would have helped him assess Brooks. Here, too, there are disparities between what Bertschinger's affidavit says he did not have and what his testimony shows he did have. Although Bertschinger claimed he did not have information about "Brooks' suspicions that his co-workers . . . intended to poison him," he testified that Brooks "develop[ed] some suspicions regarding people at work" and "thought people were trying to poison his food." Although Bertschinger claimed he did not know about "Brooks' self-imposed isolation from family members," he testified that Brooks "withdr[e]w from contact with friends, and to some degree, withdrew even in his contacts with family."

Just as his ultimate access to this information undermines a claim of prejudice, so too does his theory of prejudice. Bertschinger's affidavit (and Dr. Sandra McPherson's nearly identical affidavit) indicated that "this collateral information would have provided evidence to support the diagnosis that Brooks suffered from . . . paranoid schizophrenia." Yet the state courts already had that diagnosis in front of them. Another defense expert, Althof, gave this diagnosis at sentencing; the State's principal expert accepted a similar diagnosis; and the sentencing panel found that Brooks suffered from schizophrenia.

Bertschinger's (and McPherson's) affidavit responds that the additional information would have shown that Brooks was "actively psychotic and delusional shortly before his sons' deaths" and that such "psychosis and delusions would have had an important impact on Brooks' behavior at the time of his sons' murders." But based on this allegedly new information, Bertschinger tellingly did not opine (and neither did McPherson) that Brooks did not appreciate the criminality of his conduct or did not have the ability to conform his conduct to the requirements of the law. In the absence of such an opinion from someone who evaluated Brooks and in the presence of an opposing opinion from Billowitz, there is no tenable basis for saying that the sentencing panel's conclusion regarding the impact of this mitigating factor—or, for that matter, any other mitigating factor—would have been different.

More, the claimed prejudice expressed in Bertschinger's affidavit cannot be squared with a central feature of his testimony—that he could not diagnose Brooks' mental condition at the time of the murders without information directly from Brooks, which Brooks could not provide in view of his claimed amnesia. *See, e.g.*, JA 1114 ("[W]ithout information from Mr. Brooks, there is no way I can give an opinion with reasonable medical certainty either on the issue of sanity . . . and certainly not on the issue of mitigation."). How, if Bertschinger needed information directly from Brooks, information provided by other people about events mainly occurring two or so years before the murders could have swayed his conclusions is not explained.

Which leads to the last problem with Brooks' reliance on Bertschinger's affidavit: the essence of Bertschinger's mitigation testimony (and a central theme of counsel's mitigation strategy) was that Brooks' amnesia made it impossible to know his state of mind on the day of the murders, precluding anyone from concluding that the aggravating factors outweighed an unknowable and significant mitigating factor. That reasonable strategy was consistent with Bertschinger's testimony that he could not diagnose Brooks with schizophrenia without speaking to him directly about the day of the murders. Yet the strategy of Brooks' habeas petition (and the theory of Bertschinger's affidavit) is that a diagnosis based on collateral information primarily from two or more years before the murders could be made even without the assistance of Brooks, a strategy that surely has a "double edge" to it when it comes to Brooks' reasonable trial strategy, *Wiggins*, 539 U.S. at 535, making a reasonable possibility of prejudice still more implausible.

*Affidavits of Azeem Bey (Brooks' stepfather), John Brooks (Brooks' uncle) and Joyce Robinson (Brooks' former co-worker and a friend of Beverly Brooks).* These affidavits all fail to advance Brooks' claim. While they say that Brooks' counsel did not contact them during his criminal trial, they do not, as the state court of appeals explained, "state what [specific or new] information the witness[es] would have provided if contacted before trial." *Brooks*, 1999 WL 401655, at *5. In the absence of this information, these affidavits cannot establish prejudice.

*Affidavits of Patricia Walsh, Richard Vickers and Stephen Aarons (attorneys).* Nor is Brooks aided by the affidavits of attorneys who were not involved in the guilt or sentencing phase of this case and who now criticize the performance of the three-judge panel and of Brooks' counsel and his experts. Walsh's affidavit, for its part, does not even allege that Brooks' counsel failed to investigate Brooks' background or failed to provide specific information to the mental-health experts who evaluated Brooks, but rather contains largely conclusory allegations of other errors committed by Brooks' counsel and by the three-judge panel. Vickers' affidavit contains similar flaws and undermines Brooks' claim by including information concerning Angelotta's investigation that substantially refutes several of Brooks' and the other affiants' contentions about who spoke to whom. Aarons' affidavit does not establish prejudice because it fails to explain how additional evidence relating to Brooks' schizophrenia could have changed the sentencing panel's conclusion.

*Affidavit of Dr. Nancy Schmidtgoessling (clinical psychologist).* Submitted by a psychologist not involved with Brooks' trial, this affidavit alleges errors committed by Brooks' counsel and his

experts.   Schmidtgoessling says that Brooks' counsel failed to make "contact with [his] employers . . . and immediate family other than brief contact with Brooks' brother," failed to discover "Brooks' belief that he was being poisoned at work" and did not present adequately Brooks' paranoid schizophrenia as a mitigating factor.   But the record—Angelotta's itemized statement and Bertschinger's testimony—casts doubt on several of Schmidtgoessling's allegations.  Even then, the affidavit does not establish prejudice because it fails to explain how or why a more "detailed, integrated picture of Brooks and his psychological functioning" could have persuaded the panel to give Brooks a life sentence in view of the information about his mental-health history that the panel heard.

    *Affidavits of Raymond Goodwin and Gary Cartwright (Utah prison officials) and Donald Williamson (Brooks' high school friend).*  The affidavits of the Utah prison officials who worked in the facility where Brooks was held pending extradition to Ohio indicated that Brooks' "behavior at all times was highly appropriate," that Brooks "[a]t no time . . . display[ed] violent or negative behavior towards his jailors or other prisoners" and that Brooks "remained quietly in his cell unless requested to leave."  This information does not offer any glimpse into Brooks' state of mind before the murders and hardly suggests that he was actively psychotic and delusional on the day of the murders.  The affidavit of Donald Williamson, one of Brooks' high school friends, also had a two-sided edge to it.  Although it said that Brooks appeared "wild" and "crazy" after he fought with his kids, it also said that Brooks thought his children "tried to physically intimidate him" and that Williamson told Brooks "to discipline his sons so that they would not be disrespectful."  These latter statements would have buttressed the sentencing panel's conclusion that Brooks "execute[d his children] through a twisted sense of jealousy, hatred, or despair," as would the information about Brooks' attitude toward his oldest son's trophies and alleged incestuous relationship with Beverly.

    Brooks' claim is not only susceptible to being divided and conquered one affidavit at a time, but it also does not show prejudice when the affidavits are grouped together.  In determining that the aggravating factors outweighed these mitigating factors, the sentencing panel concluded that Brooks' schizophrenia "did not cause him to lack substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law."

    Considerable evidence supported the conclusion that, in the days leading up to the March 6th murders and in the days following them, Brooks knew just what he was doing.  On February 24, Brooks obtained a Visa card and took out a cash advance of $140 from the account.  The following day, he purchased a gun for $125.  On March 4, Beverly served Brooks with divorce papers, after which he told Beverly that "he was going to burn the papers" and "that if he didn't know better that he would be afraid of himself."  Two days later, shortly after Beverly left for work, Brooks turned up the stereo in the house—to "muffle the sound of the gunshots" and thus keep the upstairs neighbors from hearing them, *Brooks*, 495 N.E.2d at 414—and shot his sons in the head while they lay sleeping.

    Brooks' actions immediately after the killings also suggest that he knew what he had done and shamelessly but cogently did not want to be held responsible for it.  That same afternoon, he fled Cleveland on a bus bound for Las Vegas.  When apprehended by authorities two days later, Brooks "admitted ownership of an innocuous suitcase found in his possession on the bus" and "stated then that it was his only luggage," but he "didn't tell the police of the luggage containing the murder gun and ammunition and denied any connection to it when it was found and he was confronted with it."  Brooks also had his high school diploma and his birth certificate with him at the time.

    Confronted with these facts, the trial court "rejected [Brooks'] claim of psychogenic amnesia," concluding that Brooks' "denials were lies, not memory lapses."  In view of  Brooks' behavior shortly before and after the crime, the court also concluded that, even though Brooks suffered from schizophrenia, his "mental illness or defect did not cause him to lack substantial

capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law." Stated differently, the court acknowledged that Brooks was suffering from schizophrenia but nonetheless relied upon the evidence of Brooks' behavior shortly before and after the murders to conclude that he willingly, and with "the ability to refrain," "chose to take a gun to the heads of his three sons and execute them through a twisted sense of jealously, hatred, or despair." The court of appeals and supreme court reached the same conclusion. *See Brooks*, 495 N.E.2d at 414; *Brooks*, 1985 WL 8589, at *12.

Placed in the context of this evidence of Brooks' calculated actions on the one hand and of his strange behavior and schizophrenia on the other, Brooks' undiscovered background evidence—his brother's schizophrenia and Beverly's three additional examples of unusual behavior (Brooks' belief in voodoo, his accusations regarding incest and his actions related to his son's trophies)—does not offer a basis for concluding that this new evidence would have tilted the verdict. It does nothing to alter the unchallenged point that his actions revealed a clear awareness of what he was doing and a desire to avoid responsibility for it. At bottom, the new evidence thus does not "differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill*, 400 F.3d at 319.

Another problem with the affidavits is that they did not present evidence concerning Brooks' state of mind immediately around the time of the murders. Beverly's affidavit, for instance, referred almost exclusively to events that occurred in 1976–80—at least two years before the murders. Even accepting that Beverly's affidavit presented some previously unknown information, we fail to see how this evidence would have changed the panel's decision. Bertschinger's own testimony indicates that such evidence "would serve little benefit, frankly, without also information directly from the defendant" because "it would not tell [him] directly and concisely about [Brooks'] mental state during the time of the offense, and that is what [he was] concerned with." Bertschinger explained: "I am primarily concerned as a forensic psychiatrist about [Brooks' state of mind] *that morning of the murders* and particularly more related to when that trigger was pulled . . . . The best I have [regarding Brooks' state of mind at that time] is from Mrs. Brooks that [Brooks] appeared reasonably intact from her observations on the night before or the morning before. That is all I have, and *without information from Mr. Brooks*, there is *no way* I can give an opinion with reasonable medical certainty either on the issue of sanity, if we were dealing with that, and certainly not on the issue of mitigation." (emphasis added).

The sentencing panel reasonably concluded that, regardless of whether Brooks had schizophrenia of any type at the time of the murders, his actions during the hours, days and weeks before and after the murders indicate that he knew what he was doing, knew that it was wrong and could have stopped himself from doing it. *See Brooks*, 495 N.E.2d at 415 ("The court of appeals realized that appellant suffered from *some form* of schizophrenia but found appellant did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. . . . This court finds that the trial court and court of appeals did not err in concluding that the aggravating circumstances of the crime outweigh any mitigating factors.") (emphasis added). Thus, even if the affidavits suggested that Brooks was more actively schizophrenic at the time of the murders than the evidence at trial showed, the post-conviction court of appeals reasonably determined that the panel's decision would have been the same.

III.

For these reasons, we affirm.