RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MARK W. WILES,

  *Petitioner-Appellant,*

  *v.*

No. 05-3719

MARGARET BAGLEY, Warden,

  *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00992—Paul R. Matia, District Judge.

Argued: December 11, 2008

Decided and Filed: April 14, 2009

Before: MARTIN, SILER and SUTTON, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** John J. Ricotta, LAW OFFICE, Cleveland, Ohio, for Appellant. Adam Michael Van Ho, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** John J. Ricotta, LAW OFFICE, Cleveland, Ohio, Henry J. Hilow, McGINTY, HILOW & SPELLACY, Cleveland, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

  SUTTON, J., delivered the opinion of the court, in which SILER, J., joined. MARTIN, J. (pp. 10-15), delivered a separate concurring opinion.

───────────────

**OPINION**

───────────────

  SUTTON, Circuit Judge. Mark Wiles murdered a fifteen-year-old boy with a kitchen knife during a botched burglary in 1985. After he waived his right to a jury trial, a panel of three Ohio judges convicted him of aggravated murder and aggravated burglary, then sentenced him to death. After exhausting his state-court appeals and post-conviction

remedies, Wiles sought a writ of habeas corpus under 28 U.S.C. § 2254, arguing (among other things) that he was denied the effective assistance of counsel under the Sixth and Fourteenth Amendments. Because Wiles has not shown that he was prejudiced by his counsel's alleged shortcomings, we affirm.

I.

In 1982, Wiles went to work as a part-time laborer for Charles and Carol Klima on their horse farm, where they lived with their son Mark. *State v. Wiles*, 571 N.E.2d 97, 103 (Ohio 1991). One day in early 1983, the family learned that $200 in cash was missing. That same day, Wiles had reported for work, but he could not be found after the Klimas learned of the missing cash, and he did not return to collect his paycheck or for that matter return to work any longer on the farm. *Id*. at 103–04. In the spring of that year, Wiles began serving a 4–25 year sentence in an Ohio prison for an unrelated burglary he had committed the previous year.

On August 7, 1985, after serving eighteen months of this sentence, Wiles returned to the Klima farm, entered the unlocked house while the family was gone and began to search the house for valuables. *Wiles*, 571 N.E.2d at 104. While he was still in the house, Mark Klima returned and confronted him. *Id.* Wiles stabbed the boy 24 times with a kitchen knife, stole approximately $260 and fled. *Id.* Carol Klima returned home to find her unconscious son lying on the floor with a knife buried in his back. *Id.* Later that day, Mark Klima died in a hospital emergency room. *Id.*

Wiles initially fled from the authorities. Five days after the murder, however, he turned himself in to the police in Savannah, Georgia, telling them that he was wanted for murder in Ohio. *Id.* at 105. After being informed of his rights, he told the police what he had done and signed a confession admitting that he had killed Klima. *Id.*

A state grand jury indicted Wiles for aggravated murder and two counts of aggravated burglary—one for the 1985 home invasion, one for the 1983 $200 theft. *Id.* at 105–06. He waived his right to a jury, and a three-judge panel heard his case. *Id.* at 106–07. After the guilt phase of the proceedings, the court determined that there was insufficient evidence that he had committed the 1983 burglary but convicted him on the aggravated-

murder and the other aggravated-burglary count. *Id.* at 107. After a mitigation hearing, the court determined that neither Wiles' youth (he was 22-years old at the time of the murder) nor his confession outweighed the aggravating circumstances of his crime. *Id.* at 107–08. The court imposed a death sentence, and the Ohio Court of Appeals and the Ohio Supreme Court affirmed his conviction and sentence. *Id.* at 108, 125; *State v. Wiles*, No. 1675, 1988 WL 59838, at *10 (Ohio Ct. App. June 3, 1988).

Wiles filed a state post-conviction petition, which included a claim that his trial counsel had provided constitutionally inadequate assistance at the mitigation phase of the trial. The state trial and appellate courts rejected the petition. In rejecting his ineffective-assistance claim, the court of appeals concluded that Wiles "ha[d] failed to demonstrate ineffective assistance of his trial counsel at the . . . penalty phase" and that "he [was] unable to demonstrate with a reasonable probability that the result at trial would have been different" if his counsel had not made the alleged errors. JA 918. The Ohio Supreme Court declined review. *State v. Wiles*, 754 N.E.2d 260, 260 (Ohio 2001).

In 2002, Wiles filed a petition for a writ of habeas corpus in federal court, raising 36 claims. The district court denied the petition in 2005 and declined to issue a certificate of appealability on any of the claims. Wiles sought a COA from us, which we granted with respect to the claim that his attorneys failed him at the penalty phase of his trial.

II.

To establish ineffective assistance of counsel, a claimant must show two things. He must establish that his attorneys' performance was "deficient," which "requires showing that [they] made errors so serious that [they were] not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And he must show that "there is a reasonable probability that, but for counsel's [failure to investigate], the result of the [mitigation hearing] would have been different." *Id.* at 694.

Like all claimants seeking federal habeas relief after 1996, Wiles faces another hurdle: the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214. Under that legislation, we may grant the writ only if the state court of

appeals' decision "was contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1).

A.

In maintaining that his trial counsel did not adequately prepare for the mitigation hearing, Wiles claims that his attorneys failed (1) to uncover abuse in his childhood, (2) to uncover that he had taken barbiturates before entering the Klimas' house on the day of the murder and (3) to investigate a head injury he received twelve days before the murder. Even if we grant for the sake of argument that these claimed lapses meet the first prong of *Strickland* (ineffective assistance), they do not meet its second prong (prejudice). *See Poindexter v. Mitchell*, 454 F.3d 564, 572 (6th Cir. 2006).

Wiles has not shown that "there is a reasonable probability" that, but for this alleged absence of investigation, "the result" of the mitigation hearing "would have been different." *Strickland*, 466 U.S. at 694. Above all, the new evidence does not "differ[] markedly from the testimony and evidence the [three-judge panel] in fact considered." *Hill v. Mitchell*, 400 F.3d 308, 332 (6th Cir. 2005).

*First*, the new family-history evidence about Wiles' father and mother adds little to what was introduced at the mitigation hearing. As to his father: Counsel introduced evidence at the trial showing that his father was "stern," JA 1037, that he was "less tolerant with [Wiles] than he was [with] the other[] [children]" and that he viewed Wiles as an "interference . . . in [the family's] life" because "[Wiles] was not a planned child," JA 1302–03. A counselor's report also described the following incident between Wiles and his father when Wiles was 17:

> Mark has been high everyday during the past week. Sat. 1-10 his father and him got into a fight. His father got rough w/ him. Mark got pushed down some steps. Mark['[]s father called the police and had him charged w/ intoxication. Mark was placed in detention . . . .

JA 981.

Most of the ostensibly new evidence represents variations on this same theme. For example: Wiles claims that the court should have heard that his father was emotionally distant—that he was "not one to touch much," JA 783; that, after Wiles began serving time

in prison for his first burglary in 1983, his father "washed [his] hands of him and did not visit him," JA 744; that his father stated that he "never wanted that bastard anyway," JA 746; that he told Wiles that he "would never amount to anything and that he did not want him," *id.*; and that Wiles suffered "emotional[] and physical[] abuse" from his father, JA 747, though the affidavit to this effect (from his sister Jona) offers no details about any incidents of physical violence. All of this evidence adds little to the picture that counsel already had painted of Wiles' father: a man who did not like Wiles, who resented him as an unwanted addition to the family and who, on occasion, "got rough" with him, JA 981. This is precisely the "kind of cumulative evidence that does not show prejudice," *Brooks v. Bagley*, 513 F.3d 618, 626 (6th Cir. 2008), because it does not "differ in a substantial way—in strength [or in] subject matter—from the evidence actually presented at sentencing," *Hill*, 400 F.3d at 319.

Wiles, however, does identify one new piece of evidence that was not covered at the trial—the allegation that his father was "sexually inappropriate with his sisters." JA 754. According to Wiles' post-conviction psychological expert, Robert Smith, "Wiles reluctantly disclosed that his father was 'sexually inappropriate' with his sisters." JA 754. New though this allegation may be, it is not corroborated: Neither Wiles' father, his sister, nor his mother mentions any such abuse in their affidavits. Even if we accept the allegation as credible, moreover, it still amounts to exceedingly weak mitigation evidence, because nothing shows that Wiles was aware of this abuse at the time of the murder, and there is no evidence that it caused him any psychological harm beyond what he had already experienced at the hands of a distant and sometimes abusive father. Confirming the point, Smith does not refer to these allegations in discussing Wiles' troubled relationships, his overall diagnostic impressions of Wiles or his impressions of Wiles' mental state at the time of the crime. Absent evidence that Wiles knew of the abuse or even evidence about how it might have affected his psychological profile, we see no tenable basis on which it could have altered the three-judge panel's sentence.

As to Wiles' mother: Counsel offered evidence at the mitigation hearing from a school psychologist who said that his "mother [was] ignoring" and that the family was "not close." JA 1037. Wiles claims that his attorneys also should have introduced evidence that his mother "was quite depressed and cleaned the house all the time for [their] father." JA 746. The expert witness, Smith, likewise spoke of the mother's "long-standing history of

depression," which prompted her to "spen[d] a considerable amount of time sleeping and withdrawing from the family and others." JA 755. But this evidence adds little to what the three-judge panel heard. There is no indication that the depression affected Wiles in any way beyond causing his mother to "withdraw[]" from the family, *id.*, and a similar theory was put before the three-judge court when it heard evidence that she "ignor[ed]" him, JA 1037.

*Second*, the ostensibly new evidence of drug use suffers from a similar flaw. Wiles argues that his counsel failed to introduce evidence about his "drug problems, which escalated after an industrial accident which caused the tragic death of his brother." Br. at 20. Yet this evidence, once again, largely duplicates what the judges already heard. Wiles' attorneys presented ample evidence at the mitigation hearing of Wiles' history of drug and alcohol abuse, the death of his brother Randy and the impact these events had on him.

Here, too, there is an exception. Wiles argues that his prior attorneys should have discovered—and should have presented to the court—evidence that he ingested "3 or 4 barbiturates shortly before entering the Klima home," which prevented him from thinking "clearly" at the time of the offense. Br. at 11–12. Even if we accept this new evidence as true, even if we accept that his counsel did not know about this fact and even if we overlook the conspicuous oddity that Wiles himself did not tell his counsel about this background information, there is no prejudice and indeed the omission of this evidence likely benefited Wiles. For one thing, this evidence directly contradicts his confession to the crime, in which he denied consuming drugs on the day of the murder or within the previous twelve days. The claim therefore was readily impeachable, making it unlikely to change the outcome of the hearing for that reason alone. *See Owens v. Guida*, 549 F.3d 399, 411 (6th Cir. 2008). For another, Wiles' mitigation strategy emphasized, quite understandably, that he had confessed truthfully in all respects to the crime, *see Wiles*, 1988 WL 59838, at *8, but this evidence would have undercut that mitigation theme. For still another, it is hardly self-evident that getting high on barbiturates before stabbing someone to death is the kind of evidence that makes a capital defendant look better in the eyes of a court as opposed to "mak[ing] him look even worse." *Carter v. Mitchell*, 443 F.3d 517, 532 (6th Cir. 2006). Wiles had little to gain from this new evidence and much to lose by introducing it. He thus cannot show prejudice by its omission.

*Third*, Wiles contends that his counsel failed him by not investigating a head injury he sustained twelve days before the murder. As Wiles tells it, a man named Joe Kelly "jumped [him] and hit [him] on the head with a tire iron" when he was leaving a bar, knocking him unconscious. Br. at 12–13. He arrived at the emergency room with cuts on his face and with his right eye "swollen shut," JA 568, and an examination showed that he had "multiple facial bone [fractures]," *id*. After doctors cleaned and closed his wounds, Wiles left the hospital against medical advice, only to return five days later complaining of "dizziness, somnolence and difficulty walking." *Id.*

Notably absent from the record is any evidence that Wiles was still experiencing symptoms from his head injury on the day he murdered Mark Klima. Wiles argues only that investigation by his counsel prior to the mitigation hearing, including "retention of a neurologist and a follow up CAT SCAN, may have assisted counsel . . . in explaining to the fact finders a causal . . . connection between the head injury and [his] uncharacteristic violent behavior." Br at 13–14. But such "speculation" as to the effects *still-further* investigation might have on the outcome of this theory at the mitigation hearing does not by itself establish prejudice. *See Slaughter v. Parker*, 450 F.3d 224, 234 (6th Cir. 2006). This claim, too, necessarily fails. All of these arguments considered, the state court of appeals reasonably applied *Strickland* in concluding that Wiles failed to show prejudice from the failure to present this additional evidence.

B.

Wiles separately argues that his attorneys did not adequately prepare Dr. Willis Carpenter Driscoll, a psychologist, for the mitigation hearing: They gave Driscoll too little time to prepare for the hearing because they hired him a week before the hearing; Driscoll interviewed Wiles for just two hours and never spoke to any of his family, friends or coworkers; and Driscoll never reviewed Wiles' educational records. Driscoll's inadequate preparation, according to Wiles, led him to testify in a way that failed to convey a useful mitigation theory to the three-judge panel. Even if we accept this theory of ineffective assistance for the sake of argument, Wiles again has failed to show prejudice.

Driscoll's inadequate preparation, Wiles urges, caused Driscoll to admit a damning fact on cross-examination, namely that "one of the many factors" that motivated Wiles to kill

Klima was that the boy was "the only witness" to the burglary. JA 1421. But it is hard to see how this admission could have affected the death sentence. By this stage in the case, the three-judge panel already had determined that Wiles killed Klima "for the purpose of escaping detection, apprehension, trial or punishment for another crime." *Wiles*, 571 N.E.2d at 106. Once the panel found that fact to be true beyond a reasonable doubt, defense counsel had every reason to accept, rather than challenge, that premise of the guilt determination and to work with, rather than reargue, the point during the mitigation hearing. A psychologist's "admission" of a fact at a mitigation hearing, one already established beyond a reasonable doubt at the liability hearing, does not establish prejudice.

Nor has Wiles succeeded in showing that a better-prepared expert would have given more useful testimony. As an example of what a well-prepared expert would have said, he offers the affidavit of Robert Smith, who has a Ph.D., a license in clinical psychology and extensive clinical experience in that field, and who has interviewed Wiles and reviewed the relevant records in this case. But Smith's submission, too, adds little to what the court heard at the hearing.

Smith opines that "the antisocial behaviors reported by Mr. Wiles are directly related to his substance dependence" and says that the murder was a "direct result" of Wiles ingestion of barbiturates. JA 765, 767. As explained, however, linking Wiles' conduct to drug abuse was already in front of the panel and linking the crime to the recent consumption of barbiturates was inconsistent with his confession and with the prevailing theme of his case for leniency.

The other explanation Smith offers for the murder was that Wiles had "interpersonal difficulties," in particular a poor relationship with his parents and a brother who died shortly before Wiles began high school. JA 767. But, as mentioned, the three-judge panel heard considerable testimony regarding Wiles' difficult family circumstances, including Driscoll's opinion that Wiles' "emotional development ha[d] been arrested at the age of 10 [to] 12" due, in part, to the "dearth of warmth from his father," JA 1399, and that Wiles' desire "to punish himself" due to an overabundance of guilt led him to kill Klima, JA 1424. In the end, Wiles has not shown that he was prejudiced by his counsel's preparation of and reliance on Driscoll or that the state court of appeals unreasonably concluded otherwise.

III.

For these reasons, we affirm.

_____

**CONCURRENCE**

_____

BOYCE F. MARTIN, JR., Circuit Judge, concurring. I concur in the panel opinion. Wiles has not shown that his counsel was unconstitutionally ineffective during the mitigation phase of his trial.

*    *    *

Now in my thirtieth year as a judge on this Court, I have had an inside view of our system of capital punishment almost since the death penalty was reintroduced in the wake of *Furman v. Georgia*, 408 U.S. 238 (1972). During that time, judges, lawyers, and elected officials have expended great time and resources attempting to ensure the fairness, proportionality, and accuracy that the Constitution demands of our system. But those efforts have utterly failed. Capital punishment in this country remains "arbitrary, biased, and so fundamentally flawed at its very core that it is beyond repair." *Moore v. Parker*, 425 F.3d 250, 268 (6th Cir. 2005) (Martin, J., dissenting). At the same time, the system's necessary emphasis on competent representation, sound trial procedure, and searching post-conviction review has made it exceedingly expensive to maintain.

The system's deep flaws and high costs raise a simple but important question: is the death penalty worth what it costs us? In my view, this broken system would not justify its costs even if it saved money, but those who do not agree may want to consider just how expensive the death penalty really is. Accordingly, I join Justice Stevens in calling for "a dispassionate, impartial comparison of the enormous costs that death penalty litigation imposes on society with the benefits that it produces." *Baze v. Rees*, ___ U.S. ___, 128 S.Ct. 1520, 1548-49 (2007) (Stevens, J., concurring). Such an evaluation, I believe, is particularly appropriate at a time when public funds are scarce and our state and federal governments are having to re-evaluate their fiscal priorities.[1] Make no mistake: the choice to pay for the

_____

[1]Here, I will focus on the public costs of capital punishment. But it has significant, often overlooked private costs as well. *See, e.g.*, Thomas P. Sullivan, *Efforts to Improve the Illinois Capital Punishment System: Worth the Cost?*, 41 U. RICH. L. REV. 935, 967 (2007) (noting "the psychological and often the financial injuries inflicted on victims' families," upon the defendant's family, and upon the defendants themselves); Charles S. Lanier & James R. Acker, *Capital Punishment, The Moratorium Movement, and Empirical Questions: Looking Beyond Innocence, Race, and Bad Lawyering in Death*

death penalty is a choice *not* to pay for other public goods like roads, schools, parks, public works, emergency services, public transportation, and law enforcement. So we need to ask whether the death penalty is worth what we are sacrificing to maintain it.

And, while this is a matter that would benefit from further study,[2] the evidence indicates that, on average, every phase of a capital case is more expensive than in a non-capital case, and that the lifetime cost of a capital case is substantially more than the cost

---

*Penalty Cases,*10 PSYCH. PUB. POL. & L. 577, 603 (2004) (discussing the "host of secondary victims" affected by capital punishment).

[2]*See, e.g.*, SUSAN S. EVERINGHAM, RAND CORP., INVESTIGATING THE COSTS OF THE DEATH PENALTY IN CALIFORNIA (2008) (discussing challenges in assessing the total costs of the death penalty), *available at* www.rand.org/pubs/testimonies/CT300/.

One aspect of this problem that merits further attention is the relationship between the threat of a capital charge and plea bargain rates. *Compare* KENT S. SCHEIDEGGER, CRIMINAL JUSTICE LEGAL FOUNDATION, THE DEATH PENALTY AND PLEA BARGAINING TO LIFE SENTENCES (2009) (arguing that the availability of the death penalty affects plea bargain rates), *available at* www.cjlf.org/papers/wpaper09-01.pdf, *with* Ilyana Kuziemko, *Does the Threat of the Death Penalty Affect Plea Bargaining in Murder Cases? Evidence from New York's 1995 Reinstatement of Capital Punishment*, 8 AM. L. & ECON. REV. 116 (2006) (concluding that availability of a capital charge affects the terms of plea bargains but not their frequency).

of incarcerating an inmate for life without parole.[3] Surprising as that may seem, the reason for it is simple: "lawyers are more expensive than prison guards."[4]

To begin, capital cases involve more pre-trial and trial costs than non-capital cases.[5] Capital cases are far less likely to be resolved through plea bargain,[6] and they

---

[3] For data on the costs of state capital cases, see CALIFORNIA COMMISSION ON THE FAIR ADMINISTRATION OF JUSTICE, FINAL REPORT 147 (2008) (estimating that a system of life without parole would save $121.2 million annually); JOHN ROMAN, ET AL., URBAN INSTITUTE, THE COST OF THE DEATH PENALTY IN MARYLAND 2 (2008) (finding that average lifetime cost of a capital case is $1.9 million more than the average non-capital case); WASHINGTON STATE BAR ASSOCIATION, FINAL REPORT OF THE DEATH PENALTY SUBCOMMITTEE OF THE COMMITTEE ON PUBLIC DEFENSE (2006) (finding that the cost of a capital trial and post-conviction proceedings is $467,000 more than life without parole); MARY E. FORSBERG, NEW JERSEY POLICY PERSPECTIVE, MONEY FOR NOTHING? THE FINANCIAL COST OF NEW JERSEY'S DEATH PENALTY (2005) (finding capital punishment created $253 million in additional costs from 1983 to 2005, or $11 million per year); STATE OF KANSAS, LEGISLATIVE DIVISION OF POST AUDIT, COSTS INCURRED FOR DEATH PENALTY CASES: A K-GOAL AUDIT OF THE DEPARTMENT OF CORRECTIONS 10 (2003) (estimating the median cost of a capital case to be $1.2 million through execution—70% more than life without parole); INDIANA CRIMINAL LAW STUDY COMMISSION, COMMISSION REPORT ON CAPITAL SENTENCING (2002) (finding death penalty system is 35-38% more costly than one of life without parole); S.V. Date, *The High Price of Killing Killers: Death Penalty Prosecutions Cost Taxpayers Millions Annually*, PALM BEACH POST, Jan. 4, 2000, at 1A (estimating that the death penalty costs Florida an additional $51 million annually); PHILIP J. COOK & DONNA B. SLAWSON, THE COSTS OF PROCESSING MURDER CASES IN NORTH CAROLINA 78 (1993) ("The extra cost per execution of prosecuting a case capitally is more than $2.16 million."); Christy Hoppe, *Executions Cost Texas Millions Study Finds It's Cheaper to Jail Killers for Life*, DALLAS MORNING NEWS, Mar. 8, 1992, at 1A (reporting that the cost of an average capital case was $2.3 million—three times as much as a non-capital case imposing a 40-year sentence); Pamela Manson, *Matter of Life or Death: Capital Punishment Costly Despite Public Perception, It's Cheaper to Keep Killers in Prison*, ARIZ. REPUBLIC, Aug. 23, 1993, at A1; Stephen Magagnini, *Closing Death Row Would Save State $ 90 Million a Year*, SACRAMENTO BEE, Mar. 28, 1988, at A1; Robert Spangenberg & Elizabeth R. Walsh, *Capital Punishment or Life Imprisonment? Some Cost Considerations*, 23 LOYOLA L.A. L. REV. 45 (1989); Margot Garey, Comment, *The Cost of Taking a Life: Dollars and Sense of the Death Penalty*, 18 U.C. DAVIS L. REV. 1221 (1985).

For trial cost data on the federal level, see JON B. GOULD & LISA GREENMAN, JUDICIAL CONFERENCE COMMITTEE ON DEFENDER SERVICES, UPDATE ON THE COST, QUALITY, AND AVAILABILITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES 24 (2008) (finding the median defense cost of authorized cases to be $353,185 as opposed to $44,809 in non-authorized cases), *available at* www.uscourts.gov/defenderservices/FDPC_Contents.cfm. The report does not address the costs of prosecution or post-conviction costs.

[4] U.C. Berkeley Law Professor Franklin Zimring, *quoted in* Sam Howe Verhovek, *Across the U.S., Executions are Neither Swift Nor Cheap*, N.Y. TIMES, February 22, 1995, at A1.

[5] *See, e.g.*, ROMAN ET AL., *supra* note 3, at 30 ("The majority (70%) of the cost differential between a death notice and a non-death notice case occurs during the trial phase. This difference is due to a greater number of pre-trial motions, longer and more intensive voir dire, longer trials and a greater amount of general preparation time.").

[6] Roughly 95% of state and federal felony cases are resolved through plea bargain. Russell D. Covey, *Fixed Justice: Reforming Plea Bargaining with Plea-Based Ceilings*, 82 TUL. L. REV. 1237, 1238 (2008). Most capital cases, on the other hand, proceed to trial. Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 CASE W. RES. L. REV. 1, 11 (1995) ("80% of capital cases go to trial."); GOULD & GREENMAN, *supra* note 3, at 18 (reporting that 65% of capital cases handled by federal defenders between 1998 and 2004 went to trial).

generally require far greater time, support services, and expertise to prepare.[7]  And capital trials are generally longer and more complex that non-capital trials.  Beyond more attorneys and attorney time, capital cases tend to involve more experts and related expenses from experts and support staff.[8]  They also require a "death-qualified" jury,[9] and bring the added costs of the "second trial" conducted during the penalty phase.[10]  And, because both sides of a capital case are usually funded at public expense, these additional costs must be counted twice in calculating the added cost of a capital prosecution.[11]

Capital cases also involve a significantly longer post-conviction appeal process than non-capital cases.  Unlike non-capital cases, capital cases almost invariably proceed through all avenues of post-conviction relief, including direct appeal, state post-conviction proceedings, at least one federal habeas petition, and multiple petitions for certiorari.  Naturally, this is because capital defendants (and advocacy groups) have a much stronger motive to pursue post-conviction remedies.  But that is their right.  Plus, experience has shown that every stage of review is needed to guard against wrongful

---

[7] *See, e.g.*, AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES 3 (rev. ed. 2003) ("[D]eath penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases.").  The ABA Guidelines go on to outline these duties and functions in detail.

[8] GOULD & GREENMAN, *supra* note 3, at 29 ("The use of experts has a substantial influence on case cost. . . . [E]xperts were utilized in both authorized and non-authorized cases.  There is a significant difference, however, in the prevalence, and hence cost, of expert assistance between authorized and non-authorized cases.").

[9] As the 2006 Report by the Washington State Bar explains, "Since a very large number of potential jurors likely will be excused, it is not uncommon for the court to summon over 1,000 potential jurors. . . . In a non-capital case, fewer than 100 potential jurors are typically summoned." FINAL REPORT OF THE DEATH PENALTY SUBCOMMITTEE OF THE COMMITTEE ON PUBLIC DEFENSE, *supra* note 3, at 16. Capital cases also involve much more searching, individualized voir dire than non-capital cases.  As a result, jury selection in a capital case can take a month instead of one or two days. *Id.* at 16-17.

[10] *See generally* AMERICAN BAR ASSOCIATION, SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES (2008).

[11] "[V]ery few" capital defendants can afford to pay for their own defense, so they rely upon public defenders or counsel appointed by the court under the Criminal Justice Act. GOULD & GREENMAN, *supra* note 3, at 16-17.

convictions and correct the unusually high rate of error that plagues capital cases.[12] However, the upshot of higher rates of collateral attack and reversal is that state and federal courts are packed with capital cases,[13] and the cases themselves take decades to wind their way through the system.[14] More appeals means more costs, regardless of why the appeals arise. And reversal means repeating all or part of the process and thus duplicating its time and expense.

So, in almost every way, capital cases are more expensive than non-capital cases.[15] And given the death penalty's exorbitant costs and many basic flaws, it is clear to me that our scarce public resources can be put to better use. This is especially so given what the public is getting for its money—little more than the time of lawyers and

---

[12]A prominent study of state and federal capital cases between 1973 and 1995 fixed the overall error rate in capital cases at 68% (as opposed to 15% in non-capital cases). JAMES S. LIEBMAN, JEFFREY FAGAN & VALERIE WEST, A BROKEN SYSTEM: ERROR RATES IN CAPITAL CASES 1973-1995 at 8-9 (2000), *available at* www2.law.columbia.edu/instructionalservices/liebman/. The study further found that 40% of the death sentences that were upheld on direct appeal and through state post-conviction were subsequently overturned during federal habeas proceedings. *Id.* at 6.

[13]Including Wiles, 118 of Ohio's 166 death row inmates (71%) have cases pending in federal court. RICHARD CORDRAY, OHIO ATTORNEY GENERAL, CAPITAL CRIMES ANNUAL REPORT: STATE AND FEDERAL CASES 2008 at 22 (2009). 28 more (17%) have cases pending in state court. *Id.*

[14]This case, involving a death sentence imposed in 1986 (when the law clerk assisting me on this case was three years old), is unexceptional in this regard. The average elapsed time from sentence to execution in 2007 was 153 months—twelve years and nine months. TRACY L. SNELL, BUREAU OF JUSTICE STATISTICS, CAPITAL PUNISHMENT, 2007—STATISTICAL TABLES (2008), *available at* www.ojp.usdoj.gov/bjs/pub/html/cp/2007/cp07st.htm. The median elapsed time since sentencing for inmates on death row at the end of 2007 was 133 months. *Id.*

[15]This is in spite of the fact that capital defense services continue to be underfunded, much to the prejudice of indigent capital defendants. *See generally* Stephen Bright, *Counsel for the Poor: The Death Sentence Not for the Worst Crime, but for the Worst Lawyer*, 103 YALE L.J. 1835 (1994); *see also* ABA MORATORIUM IMPLEMENTATION PROJECT, STATE DEATH PENALTY ASSESSMENTS: KEY FINDINGS (2007) (finding, among other things, "[T]hat . . . (4) Capital indigent defense systems, whether statewide or county-by-county, *generally are significantly underfunded*; (5) Many states are failing to provide for the appointment of two lawyers at all stages of a capital case, nor are they guaranteeing access to investigators and mitigation specialists; (6) Many states are requiring only minimal training and experience for attorneys handling death penalty cases; and (7) The compensation paid to appointed capital defense attorneys is *often woefully inadequate*, dipping to well under $50 per hour in some cases") (emphasis added).

judges and the "illusion" of capital punishment.**16** Moral objections aside, the death penalty simply does not justify its expense.

Recent news reports indicate that the cost of the death penalty is becoming part of the public debate on capital punishment and has begun to influence policymaking.**17** That strikes me as a very positive development.  I hope it continues.

---

**16**Kozinski & Gallagher, *supra* note 6, at 3.  Only nine of the thirty-six states which retain the death penalty carried out executions in 2008, a year in which there was a total of thirty-seven executions nationwide. SNELL, *supra* note14.  At the end of 2007, there were 3,220 prisoners on death row.  *Id.*

Whatever one's opinion of the intractable debate over deterrence, the empirical evidence is too inconclusive to warrant much weight.  *See generally* John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 STAN. L. REV. 791 (2005) (conducting an exhaustive review of the empirical literature on the death penalty and concluding, "Our estimates suggest not just 'reasonable doubt' about whether there is any deterrent effect of the death penalty, but profound uncertainty. We are confident that the effects are not large, but we remain unsure even of whether they are positive or negative").

**17***See, e.g.*, *Opponents Focus on Cost in Death Penalty Debate* (National Public Radio April 1, 2009); Judy Kerr, *What Price Vengeance*, SAN FRANCISCO CHRONICLE, Mar. 13, 2009, at A15; *Saving Lives and Money*, THE ECONOMIST, Mar. 12, 2009, *available at* www.economist.com/world/unitedstates/displayStory.cfm?story_id=13279051; Michelle Millhollon, *Economics of Executions*, ADVOCATE CAPITOL NEWS, Mar. 8, 2009, at 1A; Deborah Hastings, *In Hard Times, Executions Become a Question of Cost*, ASSOCIATED PRESS, March 7, 2009, *available at* www.usatoday.com/news/nation/2009-03-07-exexpensive-to-execute_N.htm; Steve Mills, *In Many States, Cost is Slowly Killing Death Penalty*, CHICAGO TRIBUNE, March 7, 2009, *available at* archives.chicagotribune.com/2009/mar/07/nation/chi-death-penalty-costsmar08; Abigail Goldman, *Debating the Cost of the Death Penalty*, LAS VEGAS SUN, March 4, 2009, *available at* www.lasvegassun.com/news/2009/mar/04/debating-cost-death-penalty/; Martha Bellisle, *Nevada Bill Requires Moratorium, Study of Death Penalty Cost*, RENO GAZETTE-JOURNAL, March 3, 2009, *available at* www.rgj.com/article/20090303/NEWS18/90303060; Ed Quillen, *The Death Penalty's Costs*, DENVER POST, March 1, 2009, *available at* www.denverpost.com/perspective/ci_11795714; Ian Urbina, *Citing Cost, States Consider End to Death Penalty*, N.Y. TIMES, February 25, 2009, at A1.

In addition to New Mexico, which abolished the death penalty on March 18, 2009, a number of states, including Colorado, Nevada, Montana, Nebraska, Kansas, Maryland, and New Hampshire are reconsidering their capital punishment policies, in part because the cost of the death penalty.  Colorado, for example, is currently considering a bill (H.B. 09-1274) that proposes to abolish the death penalty and instead spend the money saved on investigating cold cases.