*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————————

RAYMOND TIBBETTS,

        *Petitioner-Appellant,*

    *v.*

MARGARET BRADSHAW, Warden,

        *Respondent-Appellee.*

No. 06-3886

———————————————

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00114—Susan J. Dlott, Chief District Judge.

Argued: June 15, 2010

Decided and Filed: February 15, 2011

Before: BATCHELDER, Chief Judge; MOORE and McKEAGUE, Circuit Judges.

———————————————

## COUNSEL

**ARGUED:** David L. Doughten, Cleveland, Ohio, for Appellant. Holly E. LeClair, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** David L. Doughten, Cleveland, Ohio, Lori Ann McGinnis, Mount Gilead, Ohio, for Appellant. Holly E. LeClair, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

      BATCHELDER, C.J., delivered the opinion of the court, in which McKEAGUE, J., joined. MOORE, J. (pp. 17–35), delivered a separate dissenting opinion.

———————————————

## OPINION

———————————————

      ALICE M. BATCHELDER, Chief Judge. Raymond Tibbetts, an Ohio death row inmate represented by counsel, appeals the district court's decision to deny his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. A certificate of

appealability ("COA") was granted for three claims: (1) whether trial counsel was ineffective for failing to develop and present evidence about Tibbetts' mental status at the penalty phase; (2) whether trial counsel was ineffective for failing to present mitigating evidence at the penalty phase; and (3) whether counsel on direct appeal was ineffective for failing to argue that the trial court did not consider all relevant information to support the imposition of a sentence less than death. We AFFIRM the district court's decision to deny the petition for a writ of habeas corpus because we find that the efforts of Tibbetts' trial counsel were not constitutionally deficient and because any failure of the trial court to consider relevant mitigation evidence was cured by the Ohio Supreme Court's independent reweighing of the relevant mitigating factors.

## BACKGROUND

In 1998, a Hamilton County, Ohio, jury found Tibbetts guilty on three counts of aggravated murder, one count of murder, and one count of aggravated robbery, in connection with the robbery and murder of James Hicks and Susan Crawford. Each guilty verdict for the aggravated murder and murder counts contained two death penalty specifications: that the offense was committed during the course of an aggravated robbery; and that the offense included the murder of two or more persons. The Ohio Supreme Court summarized the facts as follows:

> On November 6, 1997, Hicks's sister, Joan Hicks Landwehr, arrived at Hicks's home in Cincinnati to meet him for lunch. Landwehr often visited Hicks, who was sixty-seven years old and suffered from emphysema. Due to his condition, Hicks employed Crawford as a live-in caretaker. Tibbetts, who had married Crawford just over a month earlier, also lived in the house.
>
> After getting no answer at the door and seeing Hicks's car missing from its usual parking space, Landwehr entered the home with her spare key. Landwehr went to a second-floor living room and found Hicks's dead body slumped in a chair. Landwehr immediately called 911. Landwehr noticed that her brothers' chest and stomach were bloody and that his right pants pocket, where Hicks usually kept his money, was turned inside out.
>
> When Cincinnati police officers responded a short time later, they found Hicks with a tube still connecting his nose to a nearby oxygen tank. Two

knives protruded from Hicks's chest, a third knife protruded from his back, and the broken blade of a fourth knife was also in his back. Officers found additional knives and a knife sheath near Hicks. A butcher block used to store knives lay behind Hicks's chair. Deputy coroner Daniel Schultz later determined that Hicks died as a result of multiple stab wounds to his chest that punctured Hicks's heart, lungs, and aorta. Hicks did not have any defensive wounds.

Officers searched the rest of the house and found Crawford lying dead on the floor of a third-floor room, covered with a sheet. Crawford had been brutally beaten; her head was cracked open and lay in a pool of blood. Pieces of Crawford's brain were lying on the floor next to her head. Crawford had also been stabbed several times, with one knife still stuck in her neck. Crawford also had a broken left arm, which Dr. Schultz characterized as a probable result of her attempt to ward off blows. Police found a bloodstained baseball bat and several knives near Crawford's body. Dr. Schultz concluded that Crawford died of multiple skull fractures and that at least nine of her stab wounds were inflicted after her death. In all, Crawford had been struck at least four times in the head with blunt-force blows and sustained stab wounds to her back, lungs, chest, arm, shoulder, and neck.

Dr. Schultz, who also investigated the crime scene, determined that Hicks and Crawford had been dead for several hours. Police investigators found no identifiable fingerprints on the baseball bat or the knives. The only fingerprints found in the house belonged to either Tibbetts or Crawford. There were no signs of forced entry anywhere in the residence. Police also learned from Landwehr and others at the scene that Hicks's car, a white Geo Metro, was missing. Landwehr told police that Tibbetts did not have permission to drive the car.

The day after discovering the bodies, Cincinnati police learned that a Covington, Kentucky police officer had stopped Tibbetts on the night of the murders. Just after midnight on November 6, 1997, Covington police lieutenant Michael Kraft found Tibbetts in a white Geo Metro that had broken down in the middle of an intersection. According to Kraft, Tibbetts appeared nervous and "smelled somewhat of intoxicants." Tibbetts also lied to Kraft about the car's owner, saying that the car belonged to a friend in Covington.

Kraft summoned another officer to the scene to assist Tibbetts and investigate whether Tibbetts was driving under the influence of alcohol or drugs. Officer David Finan arrived a short time later and also noted that Tibbetts was nervous and smelled of intoxicants. He allowed Tibbetts to go, however, after concluding that Tibbetts was not under the influence of alcohol or drugs. The car was towed away and impounded

by Covington police. Cincinnati police later recovered the Geo Metro from the Covington impoundment lot and found bloodstains on the steering wheel, gearshift, door panel, and brake handle.

After learning of the Covington police's encounter with Tibbetts, Cincinnati police charged Tibbetts with receiving stolen property and obtained an arrest warrant on November 7, 1997. The very next day, Tibbetts voluntarily admitted himself to the psychiatric unit at St. Elizabeth Hospital in Edgewood, Kentucky. Tibbetts told nurses that his name was Ray Harvey and provided an incorrect Social Security number. Despite the false name and identification information, nurses at the psychiatric unit recognized Tibbetts from his previous treatment at the hospital. On the same day that Tibbetts checked into St. Elizabeth, police arrested Tibbetts on the warrant for receiving stolen property and took him to a local jail for questioning.

Tibbetts signed a waiver of his Miranda rights and calmly cooperated with the two investigating officers who questioned him. Tibbetts had a noticeable cut on his hand and told the investigators he had cut his hand on a river barge where he had been staying. When an officer asked whether Tibbetts had seen his wife lately, Tibbetts responded that he had not and then terminated the interview. As police were leaving, Tibbetts queried, "What's the charge, manslaughter?" The investigators, who had not mentioned the murders to Tibbetts during the interview, responded that the matter was under investigation.

A few days later, a Cincinnati police officer retrieved from St. Elizabeth the clothing Tibbetts was wearing when he checked himself into the psychiatric unit and took it to the crime lab for DNA testing. The socks, T-shirt, and blue jeans Tibbetts was wearing on November 8, 1997, were all stained with human blood. A serologist found that the blood on Tibbetts T-shirt matched Tibbetts's blood, that blood on the socks matched Hicks's blood, and that blood on the blue jeans matched blood from Tibbetts, Crawford, and an unknown person. The serologist also analyzed blood found in the Geo Metro and concluded that blood on the door, brake handle, and gearshift matched Tibbetts's blood.

*State v. Tibbetts*, 749 N.E.2d 226, 237-39 (Ohio 2001).

In preparation for the penalty phase, trial counsel hired a mitigation specialist, James Crates, and a forensic psychiatrist, Dr. Glen Weaver. Crates obtained numerous records from the Hamilton County Department of Children Services; St. Elizabeth, Eastgate Psychiatric Center; Anderson High School; Forest Hill School District; Live Oaks Career; Transitions, Inc./Droege House; and McGuinness Corp., Tibbetts' former

employer. Crates also contacted and interviewed members of Tibbetts' family. Dr. Weaver met with Tibbetts on three occasions, each meeting lasting between two and two and a half hours. Apart from Tibbetts' own unsworn statement to the jury, Dr. Weaver was the only witness called during the penalty phase, and he testified primarily as to Tibbetts' upbringing and his difficulties with drugs and alcohol.

Dr. Weaver characterized Tibbetts' childhood as "miserable," detailing his parents' use of drugs and his father's abuse of alcohol. Dr. Weaver testified that Tibbetts was removed from his parents' home and placed into foster homes. Dr. Weaver described those foster homes as "punitive" and related that Tibbetts' sister had said that Tibbetts and his brothers "were tied in bed at night so they would not be any problem. No sheets, no pillows, no pillow case or anything. Treated more like animals. There wasn't any touching of him or the other sibling. Matter of fact, there was no touching even with his own parents." Dr. Weaver testified that Tibbetts was "essentially damaged goods when he was as [young] as five years old," and testified that his formative years "were certainly lacking in most respects." Dr. Weaver stated that Tibbetts had trouble controlling his impulses, and attributed that trouble to his difficult upbringing. Dr. Weaver testified that Tibbetts never received any psychiatric testing or treatment while a child, even though he was in the care of the state.

Dr. Weaver testified that Tibbetts started using drugs and alcohol when he was a fourteen-year-old resident of General Protestant Orphan Home. He had been playing high school football and was injured during a game. Dr. Weaver testified that Tibbetts' drug use began shortly after the injury; that Tibbetts entered a drug treatment facility in approximately 1993, and was able to remain sober for a while; but that a workplace injury required heavy painkillers which led to his return to drug abuse. Dr. Weaver also testified that Tibbetts' substance abuse led to the end of a common-law marriage, and was exacerbated by a second marriage to a woman who also abused drugs and died shortly after they married.

Dr. Weaver testified that he administered the Minnesota Multiphasic Personality Test II to Tibbetts and learned that he was "an individual with limited personality

resources or a personality control. That he was subject to instances of explosiveness rage. And that, particularly, with the use of alcohol or with drugs, he would have no ability to control the impulses which he might feel." According to Dr. Weaver, the test results also suggested that "he might exhibit features of hysterical episode. For example, he might even have dissociative episodes which he might do things which he would have no recall for later." Dr. Weaver testified that, on the night of the murders, Tibbetts experienced just such a dissociative reaction, which comports with Tibbetts' own testimony at trial that he remembered nothing of the night of the murders. Dr. Weaver also testified that Tibbetts had a reduced capacity either to appreciate the criminality of his actions or to refrain from those activities.

Dr. Weaver testified that Tibbetts could barely control his behavior while under stress when he was sober, and that his use of some combination of alcohol or drugs was "just like an explosion waiting to happen." Dr. Weaver explained that Tibbetts could become a productive individual if he was able to receive treatment in a prison setting, which would diminish his propensity for inappropriate violence.

The jury recommended that Tibbetts be given a sentence of death for the murder of Hicks and a sentence of life imprisonment without parole for the murder of Crawford. The trial court adopted the recommendation of the jury on August 27, 1998, sentencing Tibbetts to ten years for aggravated robbery, life without parole on the murder conviction, and death for the three aggravated murder convictions. Tibbetts appealed his conviction and sentence to the Ohio Supreme Court, alleging fifteen claims for relief. The Ohio Supreme Court denied all of Tibbetts' claims and affirmed the conviction and sentence, after re-weighing all of the aggravating and mitigating factors. Tibbetts then unsuccessfully sought post-conviction relief in state court, and the Ohio Supreme Court declined further review. Tibbetts filed an application to re-open his direct appeal, which was also denied.

In February 2003, Tibbetts filed a petition for a writ of habeas corpus in the district court. The district court denied his petition, but granted a COA on three claims. First, Tibbetts claims that his trial counsel was ineffective for failing to develop and

present evidence of Tibbetts' mental status at the time of the crime during the penalty phase. Tibbetts argues that he was entitled to the have a pharmacological expert testify as to the effect of alcohol and drugs on Tibbetts' mental state and, specifically, his ability to control his rage impulse. Second, Tibbetts claims that his trial counsel was ineffective for failing to present mitigating evidence at the penalty phase. Tibbetts argues that trial counsel failed to make a reasonable investigation into Tibbetts' childhood, failed to provide any evidence to corroborate the testimony offered by Dr. Weaver, and that, consequently, vital information about Tibbetts' childhood was never heard by the jury. Third, Tibbetts argues that his appellate counsel was ineffective for failing to raise, on direct appeal to the Ohio Supreme Court, that the trial court failed to consider valid mitigation evidence. Tibbetts argues that the trial court failed to consider a number of factors that were recognized by the Ohio Supreme Court, and that the Ohio Supreme Court's re-weighing of mitigation factors was insufficient to cure the error.

## ANALYSIS

We review a district court's denial of a petition for writ of habeas corpus de novo. *Tolliver v. Sheets*, 594 F.3d 900, 915 (6th Cir. 2010). Because Tibbetts filed his petition after April 24, 1996, it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Carter v. Mitchell*, 443 F.3d 517, 524 (6th Cir. 2006). Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d)(1)-(2). Factual determinations made by the state courts are presumed to be correct unless rebutted by clear and convincing evidence. *Id.* § 2254(e)(1).

"A state court renders an adjudication 'contrary' to federal law when it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law' or 'decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts.'" *Biros v. Bagley*, 422 F.3d 379, 386 (6th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "A state court unreasonably applies Supreme Court precedent 'if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular prisoner's case.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 407). "In order for a writ to issue, we must determine *both* that the state court incorrectly applied the relevant Supreme Court precedent and that this misapplication was objectively unreasonable." *Tolliver*, 594 F.3d at 916.

We emphasize that AEDPA sets forth a heavy burden for a petitioner to overcome. "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). A state court determination is not unreasonable "simply because [a federal court] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Rather, the state court's application of clearly established Supreme Court precedent must be "objectively unreasonable." *Woodford v. Viscotti*, 537 U.S. 19, 24-25 (2002).

When reviewing ineffective-assistance-of-counsel claims, we engage in a two-part inquiry.

> First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose results are reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is constitutionally deficient if it falls below an objective standard of reasonableness. *Phillips v. Bradshaw*, 607 F.3d 199, 208 (6th Cir. 2010). "The burden is on the defendant to make such a showing by identifying the acts or omissions of counsel that

are alleged not to have been the result of reasonable professional judgment," *id.* at 209, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689. To establish prejudice, Tibbetts must show that a reasonable probability exists that, but for counsel's deficient performance, the result of the proceedings would have been different. *Phillips*, 607 F.3d at 217.

Our review utilizes both the *Strickland* and AEDPA standards. Even if we were to conclude that counsel's performance fell below an objective standard of reasonableness, and that a reasonable probability exists that, but for that failure, the result of the proceeding would have been different, we must still ask whether the state court's conclusion to the contrary was "objectively unreasonable."

**I.      Failure to develop and present evidence of Tibbetts' mental state**

Tibbetts argues that his trial counsel was constitutionally deficient because he failed to call an expert in pharmacology during the penalty phase. At an evidentiary hearing before the district court, Tibbetts presented the testimony of Charles T. Kandiko, Ph.D., a pharmacologist, and Janice Ort, Psy.D., a clinical psychologist. At the hearing, Dr. Kandiko testified that he believed that Tibbetts was impaired the day of the murders, and that his aggressive actions were an effect of the combination of cocaine and alcohol. Dr. Kandiko also testified that it is possible that memory can be affected by ingesting various substances, and that there is evidence that someone could have an aggressive period while under the influence of cocaine, and then not have any memory of it later. Dr. Ort conducted additional psychiatric tests on Tibbetts, to test his mental state. She testified that a full understanding of Tibbetts' mental state would only have been possible with the input of an expert pharmacologist. Dr. Ort offered additional testimony regarding Tibbetts' mental state, based on the testimony offered by Dr. Kandiko and the additional tests she conducted.

In *White v. Mitchell*, 431 F.3d 517 (6th Cir. 2005), this court rejected a claim almost identical to the one brought here,[1] stating that we "[did] not find a meaningful difference in the two diagnoses as they pertain to the legal considerations relevant here, and therefore, we find that [Petitioner] cannot show prejudice as a result of his trial counsel's performance." *Id.* at 529-30. Dr. Weaver's testimony covered each subject Petitioner claims was necessary for a constitutionally adequate defense, including that Tibbetts' use of drugs and alcohol was an explosion waiting to happen, and that Tibbetts was unable to control his rage response while intoxicated. Tibbetts argues, however, that Dr. Weaver could not have provided the detailed testimony needed because he was not a trained pharmacologist. For the purposes of the penalty phase of Tibbetts' trial, this is a distinction without a difference. *See, e.g.*, *Clark v. Mitchell*, 425 F.3d 270, 285 (6th Cir. 2005) (holding that trial counsel was not ineffective for failing to retain a pharmacologist because a mental health expert testified at trial about the defendant's drug addiction).

We cannot conclude that a habeas petitioner is entitled to the testimony of every qualified expert who might possess some specialized knowledge regarding the petitioner's case. Because there is no meaningful difference between the testimony of Dr. Weaver and the proposed testimony of Dr. Kandiko, at least as they pertain to the legal considerations before the trial court during the penalty phase, Tibbetts cannot show prejudice as a result of his trial counsel's performance. We therefore affirm the district court's denial of relief on this claim.

## II.     Failure to investigate and present mitigating evidence at the penalty phase

In his second claim, Tibbetts argues that trial counsel failed to conduct an adequate investigation into his past. A more thorough investigation, Tibbetts argues, would have allowed greater detail regarding his childhood to be presented to the jury. Tibbetts also faults his trial counsel for failing to call any witnesses to corroborate the

---

[1]Not only were the claims in *White* virtually identical to those presented here, but the expert testimony at issue was to be offered by Drs. Kandiko and Ort, the same experts who testified at the evidentiary hearing before the district court.

testimony of Dr. Weaver.  When the adequacy of trial counsel's investigations are at issue we must consider the extent to which limitations on the investigation are supported by reasonable professional judgments.  *Strickland*, 446 U.S. at 690.  "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.*  As stated previously, we must apply "a heavy measure of deference to counsel's judgments" and Tibbetts "must overcome the presumption that, under the circumstances, challenged action might be considered sound trial strategy."  *Id.* at 689.

Tibbetts relies heavily on our case law that establishes that trial counsel *may* be constitutionally deficient if an investigation is not conducted in preparing mitigation evidence.  *See, e.g.*, *Glenn v. Tate*, 71 F.3d 1204, 1207 (6th Cir. 1996) (declaring that trial counsel was objectively unreasonable when they "never took the time to develop [mitigation evidence]" and "made virtually no attempt to prepare for the sentencing phase of trial").  However, the record here clearly shows that trial counsel engaged in an investigation of mitigating factors, including Petitioner's family history, psychological background, and every other category to which Petitioner now claims he was entitled.  While trial counsel certainly could have conducted a more thorough investigation, we cannot say that the investigation was constitutionally deficient.[2]

Moreover, Dr. Weaver testified at length about the awful state of Tibbetts' childhood.  As noted, Dr. Weaver testified that Tibbetts' parents both used drugs and that Tibbetts was removed from his home at an early age and placed into foster homes. Dr. Weaver also painted a grim picture of Tibbetts' life in those foster homes, concluding that he was treated more like an animal, tied up at night, etc.  While it is true that Dr. Weaver's testimony did not reveal some details contained in additional affidavits now offered by Tibbetts, including affidavits from his sister and a female friend of Tibbetts at the General Protestant Orphan home, Dr. Weaver did not diminish or downplay the difficulties experienced by Tibbetts during his childhood. Tibbetts argues,

---

[2]While the dissent is able to cite several cases as examples of performance by counsel that go above and beyond the constitutional minimum, Dissent at 10–11, these cases are not useful for establishing what indeed the constitutional minimum is, and whether or not Tibbetts' counsel fell below that standard.

however, that the testimony of Dr. Weaver should have been supplemented by testimony from Tibbetts' family members. But affording trial counsel a "heavy measure of deference," we cannot conclude that there is no conceivable trial strategy that would present evidence of Tibbetts' childhood through a mental health expert, as opposed to friends and family members, who might be seen as having an incentive to stretch the truth in order to save Tibbetts' life.

Furthermore, "in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hall v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). The evidence in the affidavits Tibbetts now offers does not meet this test, but is cumulative, albeit somewhat more detailed. The new evidence does not differ in subject matter—much less "in a substantial way"—from the evidence already presented at sentencing. It covers the exact same subject, namely, the difficult and abusive childhood that Tibbetts suffered. Certainly this new evidence cannot be described as "shocking, disheartening, and utterly disturbing," the kind of evidence that we have held would generally support a finding of prejudice warranting habeas relief. *See Beuke v. Houk,* 537 F.3d 618, 646 (6th Cir. 2008).

While the dissent effectively reviews the additional, cumulative evidence, it fails to explain how such evidence, had it been presented, would have done anything to change the jury's perception of Tibbetts' moral culpability for such a brutal and horrific crime. *See Jells v. Mitchell*, 538 F.3d 478, 498 (6th Cir. 2008) ("Prejudice is established where, taken as a whole, the available mitigating evidence might well have influenced [the sentencer's] appraisal of [the petitioner's] moral culpability.") (internal quotation marks omitted). This case is similar to *Phillips v. Bradshaw*, 607 F.3d 199 (6th Cir. 2010). There, the petitioner, Phillips, had been convicted of the rape and aggravated murder of a three year old girl. The jury recommended a sentence of death for Phillips. At the sentencing phase, Phillips' counsel focused on Phillips' good character and good behavior in the community. *Id.* at 210. A psychologist testified as to Phillips' low IQ, low tolerance for stressful situations, and need for a structured environment. *Id.* at 211.

The psychologist specifically testified that there was no sign that Phillips had grown up in a physically or sexually abusive environment. *Id.* In his habeas petition, Phillips claimed ineffective assistance of counsel, pointing to Child Service Bureau reports, the testimony of various half-siblings, and another psychologist's report that would have detailed an abusive childhood. *Id.* at 211-15. This court had no problem in deciding that given the brutality of the crime, such additional evidence—even covering substantially different subject matter—was not enough to conclude that the state court was objectively unreasonable in holding that there was no reasonable probability that the outcome of the sentencing would have been different. *Id.* at 219.

Here, the brutality of Tibbetts' crimes would have completely overwhelmed any additional, cumulative mitigation evidence of Tibbetts' difficult childhood. Tibbetts murdered two people—his own wife and a sixty-seven year old disabled man, suffering from emphysema, breathing from an oxygen tank. When the police found James Hicks' dead body, they found no fewer than three knives that Tibbetts had used still sticking in his body, with another blade broken off in his back. There were no signs that the disabled Hicks put up a fight. Tibbetts own wife, Susan Crawford, was able to fare slightly better, as her broken arm indicates that she may have attempted to fight off Tibbetts for a time. But that attempt failed and she succumbed to the attack, dying in a pool of her own blood, skull cracked, pieces of her brain scattered on the floor. Tibbetts also inflicted multiple knife wounds upon his wife's body, at least nine of which came after he had already killed her.

But there is no need to substitute our own judgment on the matter. The state court already concluded that such additional evidence would have made no difference in the outcome—one life sentence and one sentence of death. We cannot say that the court was "objectively unreasonable" in doing so. Tibbetts has failed to overcome the presumption that his trial counsel acted in accordance with a sound trial strategy, and he cannot show prejudice from the trial counsel's failure to present the evidence Tibbetts now offers. Moreover, Tibbetts cannot show that the state court applied these standards

in an objectively unreasonable manner.  Accordingly, we will affirm the district court's denial of this claim.

**III.      Failure to appeal the trial court's weighing of mitigating evidence**

In this third claim, Tibbetts argues that his appellate counsel was ineffective because he did not challenge the state trial judge's failure to adequately consider all mitigation evidence.  According to Tibbetts, the trial court clearly erred in failing to consider all the mitigating factors, and it was unreasonable for appellate counsel to fail to raise on direct appeal the trial court's error.  Applying the heavy measure of deference to counsel's decisions required by AEDPA, we conclude that this claim fails because it is unclear that the trial court did not consider the mitigating factors.  Moreover, even if the trial court erred and counsel was unreasonable in failing to raise the claim, there was no prejudice because the Ohio Supreme Court cured any defect by conducting an independent re-weighing of the mitigating and aggravating factors, and affirmed the sentence of death.

Tibbetts argues that the trial court violated clearly established federal law by failing to comply with the requirement that all mitigation evidence be considered at sentencing.  *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007).  Tibbetts relies, however, on a slight misstatement of the rule established in *Lockett v. Ohio*, 438 U.S. 586 (1978), and applied by the *Eddings* Court.  The rule is that the sentencer *must be permitted to consider* any relevant mitigating factor, *Eddings*, 455 U.S. at 112, not that the sentencer must expressly list all relevant mitigating factors.[3] In *Davis*, we applied the rule and remanded because the trial court had excluded mitigating evidence.  *Davis*, 475 F.3d at 774.  But the record here is devoid of any indication that the trial court excluded any evidence.  In fact, the trial court expressly

---

[3]That rule, of course, incorporates a prohibition on a trial court's express refusal to consider relevant mitigating evidence.  However, the rule does not require a trial court to make an extensive list of all possible factors in mitigation, and then address each factor in turn.  Such a rule would, of course, be an invitation to mischief, for clever counsel would always be capable of finding one additional factor, however minor, that should have been included on the list.

weighed a number of mitigating factors and stated clearly that it had considered all mitigating evidence.

Plaintiff argues that the trial judge was insufficiently clear in describing all of the mitigation evidence which was considered.  In support of this argument, Plaintiff cites to Ohio sentencing law, Ohio Rev. Code § 2929.03(F), which requires that a trial judge state, "in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in [Ohio statute], the existence of any other mitigating factors, . . . and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors."  However, even Tibbetts acknowledges that the trial court stated that there were two statutorily required mitigation factors present:  (1) lack of capacity to appreciate the criminality of his conduct; and (2) "any other factors that call for a penalty of less than death or to lessen the appropriateness of the death penalty."  Ohio Rev. Code § 2929.03(B)(3) & (7).  Tibbetts points to the fact that the trial court did not find any "other factors" in mitigation, and argues that this is evidence that the trial court failed to truly consider any "other factors."  This is pure speculation, which fails to meet the clear and convincing standard required to overcome the presumption of correctness afforded state trial courts' findings of fact.  28 U.S.C. § 2254(e)(1).

Even assuming, *arguendo*, that the state trial judge's sentencing opinion failed to meet the requirements of § 2929.03(F), the Ohio Supreme Court's independent consideration of the mitigating evidence allegedly ignored by the trial judge cured any error.  *State v. Lott*, 555 N.E.2d 293, 304 (Ohio 1990).  Tibbetts argues that the Ohio Supreme Court effectively found error in the trial court's weighing of mitigating factors when it afforded some weight to Tibbetts' troubled childhood and family background, his drug use, his expressed remorse, and his ability to maintain gainful employment prior to the work-related accident that reintroduced drugs into his life.  *Tibbetts*, 749 N.E.2d at 259.  However, even if the Ohio Supreme Court intended to make an implied finding of error, its express reconsideration of those very mitigating factors, and its subsequent decision to affirm the trial court's imposition of the death sentence cured any error.

Because the Ohio Supreme Court raised, *sua sponte*, and rejected the very claim that Tibbetts argues appellate counsel should have raised on direct appeal, he cannot show prejudice from his appellate counsel's actions. We affirm the district court's denial of relief on this claim.

## CONCLUSION

Accordingly, and for the reasons set forth above, we **AFFIRM** the district court's denial of Petitioner's habeas petition.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. Raymond Tibbetts committed a reprehensible crime, and he should be punished for the acts for which the jury found him guilty. Despite his guilt, however, his death sentence is more than troubling. Tibbetts was sentenced to death by a jury that was not presented with mitigation evidence concerning Tibbetts's mentally and physically abusive childhood that was key to understanding Tibbetts's culpability and, by extension, evidence that was instrumental to determining whether he should live or die. Because I believe that Tibbetts's counsel failed to provide constitutionally adequate representation during the penalty phase of his capital proceeding, and because I believe that Tibbetts was prejudiced by counsel's actions, I would grant his petition for a writ of habeas corpus on this ground. I must therefore dissent.

"'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Broom v. Mitchell*, 441 F.3d 392, 408 (6th Cir. 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). To prevail on a claim of ineffective assistance of counsel under *Strickland*, Tibbetts must first show that his "counsel's performance was deficient"; that is, that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687, 688. Even assuming deficient representation, however, Tibbetts is also required to show that the "deficient performance prejudiced the defense." *Id.* at 687. Moreover, Tibbetts is entitled to relief only if the Ohio courts' "rejection of his claim of ineffective assistance of counsel was 'contrary to, or involved an unreasonable application of' *Strickland*, or it rested 'on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (per curiam) (quoting 28 U.S.C. § 2254(d)). Tibbetts argues that his counsel's failure "to investigate and present" to the jury

"compelling mitigating evidence" of Tibbetts's upbringing and childhood abuse amounted to ineffective assistance of counsel such that he warrants relief from his death sentence.  Appellant Br. at 23.  For the reasons discussed below, I agree with Tibbetts's claim that counsel's representation at the mitigation phase was constitutionally inadequate and that the state courts unreasonably applied Supreme Court precedent when rejecting Tibbetts's claim on this ground.

## I.  ANALYSIS

### A.  Counsel's Deficient Performance

Under the prevailing professional standards in existence at the time of trial, Tibbetts's "counsel had an 'obligation [either] to conduct a thorough investigation of [Tibbetts's] background,'" *Porter*, 130 S. Ct. at 452–53 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)), or to make a reasonable decision that such an investigation was unnecessary, *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Counsel's "ultimate presentation" of mitigation evidence "to the jury might have been justified as the product of strategic choice" if "[b]uttressed by a reasonably adequate investigation," but defense counsel was "'not in a position to make . . . reasonable strategic choices'" when "'the investigation supporting [counsel's] choices was unreasonable.'"  *Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 536) (alterations omitted).  Tibbetts's counsel plainly did not engage in conduct sufficient to satisfy the constitutional norm, and I would hold that Tibbetts has succeeded in showing that counsel's performance fell below an objective standard of reasonableness.

It is true that the instant case is distinguishable from some of our more egregious examples of deficient performance in that Tibbetts's counsel did engage in some investigation in preparation for the penalty phase of Tibbetts's trial.  The post-conviction record indicates that counsel hired a mitigation specialist, Jim Crates.  Joint Appendix ("J.A.") at 13 (Release Form); *id.* at 14–15 (Crates Letter).  The record also indicates that a little over one month prior to Tibbetts's penalty-phase hearing, Crates interviewed Tibbetts's ex-girlfriend and the mother of his son, Robin Amburgey.  6th Cir. Dkt. Doc.

006110643575 (Trial Ex. N, Crates Notes). Notwithstanding counsel's retention of Crates and Crates's conversation with Amburgey, however, counsel's preparation and investigation stands out more for what it utterly lacked. First, neither counsel nor Crates interviewed even one member of Tibbetts's family prior to the day of the commencement of the mitigation phase despite the fact these family members could have provided counsel with extremely relevant information concerning Tibbetts's abusive childhood. It is clear that counsel knew the whereabouts of at least two family members—Tibbetts's father and sister—because, according to an affidavit from Tibbetts's father, Stanley Tibbetts, Crates contacted him sometime "before Raymond's trial," and said that he would like to speak with Stanley about Tibbetts. Although Tibbetts's father agreed to speak with counsel, Crates "never contacted [Stanley] again," and neither Crates nor trial counsel "[]ever showed up to talk." Tibbetts, S. Aff. at ¶ 2. According to his post-conviction affidavit, the *only* reason that Tibbetts's father did not speak with counsel was because no one ever asked. "No 'reasonable professional judgment' could have supported a decision not to interview" Tibbetts's father, and the failure to do so amounted to deficient performance. *Johnson*, 544 F.3d at 600 (quoting *Strickland*, 466 U.S. at 690, and concluding that counsel was deficient in failing to interview the petitioner's "*mother*, not a distant aunt or neighbor"); *Jells v. Mitchell*, 538 F.3d 478, 493 (6th Cir. 2008) (finding deficient performance where counsel "interviewed only three family members, neglecting to speak with many other family members who had lived with [the petitioner] and were available").

With regard to Tibbetts's sister, Suzanne Terry, the record indicates that Crates also contacted her but that he did so "*the day before* [she] was needed to testify in court on [her] brother's behalf," Terry Aff. at ¶ 2 (emphasis added), which hardly left sufficient time for counsel to prepare a mitigation strategy surrounding whatever information Terry could provide. *See Beuke v. Houk*, 537 F.3d 618, 644 (6th Cir. 2008) ("We will generally find that an attorney has rendered deficient performance if he waits until after a conviction to begin his mitigation investigation." (citing cases)); *Jells*, 538 F.3d at 493–94 (same). Furthermore, there is no indication that counsel or Crates actually spoke with Terry once they contacted her. Instead, the evidence reveals merely

that Crates referred Terry to Dr. Weaver and that Terry spoke with Dr. Weaver *on the morning of* the penalty-phase hearing. Even assuming that Dr. Weaver relayed all of Terry's information to counsel in the few hours immediately preceding the hearing, counsel certainly would not have had time to incorporate that information into any reasonable mitigation theory or to followup on any leads that Terry's information uncovered.

It is also important to note that the *only* reason that Tibbetts's sister did not testify was a direct result of counsel's dilatory investigative tactics. Again, it is worth emphasizing that Crates did not contact Terry until the day before the hearing. Terry Aff. at ¶ 2. Despite the short notice, Terry agreed to testify on the condition that her testimony not be filmed. Anticipating that this might prove problematic, Terry also offered to testify on film if she were given the opportunity to notify her employer and her clients that she was participating in a capital case and explain the matter. Presumably because the hearing was scheduled to begin the next day, Crates told Terry that accommodations were impossible and that it would be "good enough" for her to speak with Dr. Weaver and that Dr. Weaver would relay her testimony to the jury. *Id*. Terry affirmed that she would have testified without qualification had she known that the details of her conversation with Dr. Weaver would not have reached the jury. As with counsel's failure to interview Tibbetts's father, no reasonable judgment justified counsel's decision to wait until the day before the mitigation hearing to contact Tibbetts's sister to request that she testify.

Second, in addition to failing to speak with anyone in Tibbetts's family, counsel made no real "attempt to locate significant persons from [Tibbetts's] past who may have provided valuable testimony regarding mitigating factors." *Powell v. Collins*, 332 F.3d 376, 399 (6th Cir. 2003). As the affidavits from Tibbetts's childhood friend, Sandra Nunley, and his Alcoholics Anonymous ("AA") sponsor, Keith Riddell, indicate, however, there were at least two non-related persons willing to provide such information. In fact, Crates even recognized this, writing a letter to counsel two months before the penalty phase stating that there was "Limited or No Documentation" from AA

and that someone "must interview [Tibbetts's AA] sponsor." J.A. at 14 (Crates Letter). According to Riddell, however, no one ever did. In short, counsel's failure even to "take the first step of interviewing witnesses," *Porter*, 130 S. Ct. at 453, such as Tibbetts's father and friends, and to do so in a timely manner, in the case of Tibbetts's sister, was unsupportable, objectively unreasonable, and, as a result, plainly constitutionally deficient, *cf. Bobby v. Van Hook*, 130 S. Ct. 13, 18–19 (2009).

It is true that Tibbetts's counsel did request, approximately one month prior to the start of trial, several records concerning Tibbetts's history and childhood, which included documents from the Ohio Department of Human Services, St. Elizabeth Hospital, Tibbetts's previous employers and high school, as well the Ohio Department of Corrections. And it is also true that these records were provided to the jury to review during its sentencing deliberations. But the fact that counsel requested these records and provided them to the jury does not overcome counsel's clear investigative deficiencies. As an initial matter, it is unlikely that many of these documents could have been much help to Tibbetts, regardless of their substantive content. Many of them are illegible from years of copying; they are disorganized, at least as submitted in the record on appeal; and they cover literally decades of foster-care placements and admissions to various institutions without any accompanying explanation to place them in context. Furthermore, the records concern not only Tibbetts's upbringing but also that of his numerous siblings who, depending on the year, were not even living with Tibbetts, which made some of the records simply irrelevant, or at least less clearly pertinent. As we have stated previously, "it hardly constitutes a reasonable investigation and mitigation strategy simply to obtain Human Services records from the State, then dump the whole file in front of the jury without organizing the files, reading them, eliminating irrelevant files or explaining to the jury how or why they are relevant." *Johnson*, 544 F.3d at 602.

Even assuming that counsel was not deficient in the handling of the records—i.e., that they were legible, organized, and clearly relevant such that no explanation from counsel was required—the substantive content of the records serves only to highlight

counsel's investigative deficiencies as opposed to insulate and justify counsel's actions. The records themselves contain very little definitive information about whether Tibbetts suffered abuse as a child, but they do contain ample speculative statements from social workers and other officials that plainly would have put reasonable counsel on notice that further investigation into Tibbetts's upbringing was required. For example, the Ohio Department of Human Services records indicate that Tibbetts was "afraid of water because someone had tried to hold him under," 6th Cir. Dkt. Doc. 006110646585 at 15; that social workers were concerned that the Merrimans, Tibbetts's first foster-care family, were "not adequate[ly] nourishing the children," *id.* at 20; and that there were allegations from the older Tibbetts children that the "younger children," including Tibbetts, "were actually abused" at the Merrimans' home, 6th Cir. Dkt. Doc. 06110646582 at 38. The records also recounted the detailed allegations of abuse leveled by Tibbetts's biological mother and Tibbetts's sister. As recounted by one state social worker:

> [Tibbetts's mother believes that] Mrs. Merriman [does not] feed [Tibbetts's younger brother] enough, so his brain is suffering. [Tibbetts's mother] also had a great deal to say about the poor treatment the children are receiving at the Merriman's, saying Suzanne is now telling her the many cruelties they received; couldn't watch TV, were beaten if they soiled their pants, were tied in bed, didn't get to eat after school—had to go outside or to bed, beat Suzanne's ear—if she didn't cry, beat her harder. Suzanne says she couldn't talk before because she would be beaten if anything got back to the Merrimans. Ricky verifies these statements adding the Merrimans had eggs or french toast for breakfast, but the Tibbetts always had oatmeal. [Tibbetts's mother] said all the children are skeletons now.

6th Cir. Dkt. Doc. 006110646585 at 25. In addition to these very clear red flags, there were also ample cryptic statements throughout the various records hinting at the existence of abuse, including the fact that the state social workers refused to allow the Tibbetts children to be taken to the Merrimans, even for a visit, after they had been removed from that placement, and at least one social worker suspected that Tibbetts's time with the Merrimans "created [his] nervous disposition," 6th Cir. Dkt. Doc.

006110646583 at 6, and noted that contact with the Merrimans led Tibbetts to rock himself to sleep at night.

Additionally, despite the majority's assertion to the contrary, the fact that the *sole* mitigation witness, forensic psychologist Dr. Glen Weaver, testified at Tibbetts's mitigation hearing and conveyed some of the information that Tibbetts's sister had provided him just hours prior to his testimony and some of the information that was alluded to in the various records does not save counsel's eleventh-hour investigation. *See Johnson*, 544 F.3d at 602 ( "[A]n unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury." (citing *Rompilla v. Beard*, 545 U.S. 374, 382–83 (2005)). To be sure, Dr. Weaver conducted a thorough psychological exam and was qualified to testify as to Tibbetts's mental state at the time of the crime, which was necessary for the mitigation theory that the defense decided to present, but Dr. Weaver's understanding of the reality of Tibbetts's childhood was extremely limited, and he was not equipped to testify as to that aspect of Tibbetts's social history. For example, to obtain information about Tibbetts's past and prepare for the mitigation hearing, Dr. Weaver merely reviewed the documents introduced in the penalty phase, J.A. at 1132–33 (Weaver Test.), and met with Tibbetts for approximately six hours, *id.* at 1120–21. Like counsel, Dr. Weaver did not interview Tibbetts's family members or close friends prior to the day of the hearing and surprisingly voiced a strong aversion to doing so. *See Mason v. Mitchell*, 543 F.3d 766, 777 (6th Cir. 2008) (finding problematic the fact that a psychiatrist "based his examination and report solely on interviewing [the defendant] himself and . . . did not cover [his] background or childhood in any great detail"). In fact, when the prosecutor noted that Dr. Weaver had failed to interview third parties when evaluating Tibbetts, Dr. Weaver testified that it "certainly" was not his job to do "independent investigation" and that doing so was "rare" and perhaps inappropriate. J.A. at 1185–86 (Weaver Test.).

In short, counsel's investigation fell below the then-prevailing professional standards, and the fact that counsel uncovered and introduced some evidence does not

excuse counsel's failure to engage in basic preparation, such as conducting interviews with ready and willing family members and friends and organizing and explaining any relevant state records regarding Tibbetts's childhood. Had counsel contacted Tibbetts's family and friends at some point prior to the mitigation hearing, Dr. Weaver, who knew very little about Tibbetts's background, would not have been tasked with presenting the sole evidence about Tibbetts's upbringing, which he amassed, in substantial part, during an interview hastily conducted with Tibbetts's sister on the morning of the hearing. Tibbetts's father, his sister, his best childhood friend, and his AA sponsor could have each provided material details about Tibbetts's background and humanized Tibbetts to a degree that Dr. Weaver simply was not able to do.[1]

Given counsel's failure to interview even the most obvious of mitigation witnesses, this case is plainly distinguishable from those cases where the Supreme Court and this Circuit have held that counsel's investigation and presentation of mitigation evidence was the result of a reasonable decision and did not amount to deficient performance. *Cf. Wong v. Belmontes*, 130 S. Ct. 383, 387 (2009) (indicating that the mitigating evidence that counsel presented "was substantial," where defense counsel "put nine witnesses on the stand[,] . . . [a] number of those witnesses highlighted [the defendant's] 'terrible' childhood," including the father's alcoholism and abuse, the very poor conditions of the defendant's house, his poor performance in school, and the death of his younger sister and grandmother with whom he had a strong relationship); *Van Hook*, 130 S. Ct. at 18–19 (2009) (holding that counsel's mitigation investigation was adequate with regard to both timing and scope where counsel "spoke nine times with [the defendant's] mother (beginning within a week after the indictment), once with both parents together, twice with an aunt[,] . . . and three times with a family friend," met with several experts "more than a month before trial," enlisted a mitigation expert "when the

---

[1]Tibbetts's former girlfriend and his son's mother, Robin Amburgey, testified briefly during the *guilt phase* of the trial for the prosecution, and this testimony was submitted to the jury in mitigation. Amburgey's testimony during the guilt phase of the trial did provide some "humanizing" details with regard to Tibbetts. She mentioned that Tibbetts had periods of sobriety and had attempted to kick his drug habit, J.A. at 404, 408 (Amburgey Test.), that Tibbetts was never violent towards her or their son, *id.* at 405, and that Tibbetts cared for their son, played with him, and was a good father, *id.* at 406–07. But she provided *no testimony* concerning Tibbetts's upbringing.

trial was still five weeks away," and could not have been expected to interview "distant relatives"); *Phillips v. Bradshaw*, 607 F.3d 199, 209–10 (6th Cir. 2010) ("In his efforts to acquire mitigating evidence, [the attorney] talked with [the defendant's] mother and father, at least one of his siblings and one of his half-siblings, his grandparents, neighbors, and former teachers. [The attorney] obtained [the defendant's] school records and reviewed some [Child Services Bureau] records relating to the [the defendant's] family," and at the mitigation hearing the defendant's neighbor, grandmother, brother, and father testified); *Sneed v. Johnson*, 600 F.3d 607, 610 (6th Cir. 2010) (distinguishing the Supreme Court's recent decision in *Porter* and holding that counsel's investigation of mitigating evidence was sufficient when "counsel produced 17 witnesses, including three psychological experts, at least some of whose testimony concerned [the defendant's] mental health and severely troubled childhood"). I would thus conclude that Tibbetts's counsel's performance fell below an objective standard of reasonableness, and counsel was constitutionally deficient.

**B. Counsel's Deficient Performance Prejudiced Tibbetts**

Beyond showing that counsel was deficient for failing to investigate and present mitigating evidence, Tibbetts must further show that counsel's actions were prejudicial. The majority concludes that Tibbetts failed to demonstrate prejudice because any additional evidence that counsel failed to uncover or present would have been cumulative.

We have stated that we "reject a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective." *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005); *id.* at 286–90 (surveying cases); *see also Beuke*, 537 F.3d at 645. And, according to our case law, "'to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.'" *Broom*, 441 F.3d at 410 (quoting *Clark*, 425 F.3d at 286) (alteration omitted). The question is thus whether the additional mitigation evidence concerning Tibbetts's mentally and physically abusive childhood and upbringing differs in strength and subject

matter from the evidence introduced such that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As explained below, I believe that the evidence does demonstrate that Tibbetts was prejudiced and that a contrary conclusion is unreasonable.

At mitigation, Dr. Weaver's testimony on Tibbetts's abusive childhood consisted of the following:

> [Tibbetts] had a miserable childhood. Horrible. . . . The parents were both drug users. His father was, in addition to an alcoholic. He and two of his siblings, brothers, all of them who have been in difficulty with the law, were cared for by a 10-year-old sister, whom I talked with this morning incidentally. And when the Welfare Department—or Human Services found out about this, or when it was reported, they stepped in. And there was a continuing contact with Human Services from 1961 or '62, throughout those years, and he and his brothers were taken for foster home placement. Not very happy ones, according to his sister. . . . And he had several placements . . . which were not satisfactory. Like, they were too punitive with him. Matter of fact, the sister reported that he and his two brothers were tied in bed at night so they would not be any problem. No sheets, no pillows, no pillow case or anything. Treated more like animals. The[re] wasn't any [nurturing] of him or the other sibling.

J.A. at 1125–26 (Weaver Test.). Tibbetts's unsworn statement regarding his childhood revealed that Tibbetts did not "like to talk about [his] childhood because [he] never did like it," that he "didn't like going home" because he "didn't like to hear the hollering[ and] the belts," and that "there was no family love." J.A. at 1220–22 (Tibbetts Statement).

The evidence discovered in post-conviction materials, however, revealed a much more chaotic and abusive environment, including never-before-revealed details about Tibbetts's abuse at the hands of his biological parents. For example, Terry submitted an affidavit disclosing that Tibbetts's biological mother and father were "cruel" and engaged in "extreme violence" toward the children, requiring Terry to protect Tibbetts and the younger siblings from the blows of their parents. Terry Aff. ¶ 6. Terry also

revealed that Tibbetts's mother and father failed to provide their children with basic needs, leaving them "alone often without food or proper clothing," *id.* ¶ 7, and the children had to rely on people from the community to donate such items, lest they go hungry and cold.  Tibbetts's father also "brutalized" Tibbetts's mother, "beating her bloody with a fan and a telephone," *id.* ¶ 8, and, in general, the household where Tibbetts lived with his biological parents "was a place of constant violence," *id.* ¶ 8.  In addition to Terry's recollection of these events, an affidavit from Tibbetts's father submitted during post-conviction proceedings revealed that he would have testified first-hand that he and Tibbetts's mother were unable to care for their children.  Tibbetts, S. Aff. ¶¶ 3, 4.

Once removed from the biological household, Tibbetts did not fare any better. One of the foster-care mothers, Ms. Merriman, was a drug addict, "wacked out of her head," and never took care of Tibbetts.  Terry Aff. ¶ 11.  In fact, far from becoming a safe space for the already-abused Tibbetts, the foster-care mother's own biological children "brutalized" Tibbetts and his siblings by kicking them down the stairs, beating them with spatulas, and burning their hands on heat registers, which sent at least one child the hospital.  *Id.* ¶ 12.  The Merrimans essentially treated Tibbetts like an animal. He was required to sit in the corner of the kitchen all day long until bedtime, *id.* ¶ 11, at which point he was tied to the bed.  Although Dr. Weaver did mention this detail, perhaps equally disturbing is how this task was accomplished:  Ms. Merriman would lash "rope around [Tibbetts's] waist[] that dug into [his] stomach[]," *id.* ¶ 11, causing pain throughout the night.  Moreover, Ms. Merriman "never fed" the children while in the foster-care home, *id.* ¶ 13, and locked them outside for long periods of time without access to a toilet, causing one of Tibbetts's siblings to have a bowel impaction, *id.* ¶ 14. Mr. Merriman also abused the Tibbetts children, and according to Terry, he attempted to molest her sexually on at least one occasion while they were residing in the Merriman home.  *Id.* ¶ 14.  Tibbetts's father's affidavit indicated that he and Tibbetts's mother knew that the children were being mistreated in foster care but did nothing.  Tibbetts, S. Aff. ¶¶ 3, 4.  Ultimately, Tibbetts's mother gained authorization to remove her children from the Merrimans' care, but she decided to take only two of them, leaving Tibbetts behind.  According to Terry, when it came time for the others to leave, her mother

ignored Tibbetts, "act[ing] like [he] did not exist," and she "refused to even see" Tibbetts when he came to visit. *Id*. ¶ 15. Tibbetts's father confirmed that Tibbetts's mother simply wanted nothing to do with Tibbetts. Tibbetts, S. Aff. ¶¶ 3, 4. Perhaps Tibbetts's mother's cruelty and emotional abuse was not entirely surprising, however, as post-conviction materials also revealed that she likely had a "borderline personality" disorder and was a "dangerous" individual. *Id.* ¶ 17. The State finally removed Tibbetts from the Merriman home, and Tibbetts was placed with a second family, where he was not treated much better. *Id*. ¶ 19.

The evidentiary hearing also revealed that had counsel contacted Tibbetts's childhood friend, Sandra Nunley, counsel would have learned that once Tibbetts exited the foster-care system he was still denied an environment conducive to normal childhood development. The Children's Protestant Orphanage where Tibbetts was sent following foster care was "very strict," and although it was not physically abusive, the children were not permitted to do much of anything. Nunley Aff. ¶ 3. Nunley recounted that the people who ran the orphanage provided "no affection" or "nurturing" and there was "no opportunity to get close to or bond with any of the adults," *id.* ¶ 4, which was what Tibbetts most desired. Moreover, Tibbetts "never received visits from anyone," which was "[u]nlike the other children" at the orphanage, *id.*, and Tibbetts was never allowed to engage in activities with friends after school or participate in normal social functions, *id.* ¶ 5. Nunley also would have explained to the jury that Tibbetts so yearned for affection that she and Tibbetts often broke the rules in order to see one another. *Id.* ¶¶ 6–7.

This additional evidence is not cumulative but instead adds real substance to the story of Tibbetts's childhood that was conveyed to the jury. For example, the undisclosed evidence reveals Tibbetts's mental and physical abuse at the hands of his biological mother and father, which was not presented to the jury during the penalty phase. *Cf. Eley v. Bagley*, 604 F.3d 958, 969 (6th Cir. 2010) ("Although the evidence presented at the post-conviction hearing did go into more depth than the evidence presented by trial counsel at sentencing, it did not cover any new subject matter and was

not substantially more persuasive than the trial evidence."). The additional evidence also provides "shocking, disheartening, and utterly disturbing details about [Tibbetts's] upbringing," *Beuke*, 537 F.3d at 646, and does not merely elaborate on a difficult childhood that had been described already by several witnesses. *See Williams*, 529 U.S. at 398 (finding prejudice where the evidence that was not disclosed provided a "graphic description of [the petitioner's] childhood, filling with abuse and privation"); *cf. Wiles v. Bagley*, 561 F.3d 636, 639 (6th Cir. 2009) ("Most of the ostensibly new evidence represents variations on th[e] same theme" presented at the penalty phase); *Beuke*, 537 F.3d at 646 (concluding that details such as the fact that the petitioner had low self-esteem and was sheltered when growing up did not support a finding of prejudice despite being noncumulative); *Broom*, 441 F.3d at 410. To the contrary, as outlined above, *none* of Tibbetts's family or friends had been interviewed or testified about the details revealed in the post-conviction hearing, and Dr. Weaver's description of Tibbetts's childhood as "miserable" or "horrible," or even Dr. Weaver's example of Tibbetts's foster family as being "too punitive" by tying the children to the bed, does not even come close to conveying the extent and gravity of Tibbetts's torture and abuse. The two foster-care placements were more than just "not satisfactory," as Dr. Weaver testified, but rather they were abusive. In essence, "rather than being cumulative," the evidence that counsel failed to uncover and present "provides a more nuanced understanding of [Tibbetts's] psychological background and presents a more sympathetic picture of [Tibbetts]" that is sufficient to support a finding of prejudice. *Jells*, 538 F.3d at 501; *see Johnson*, 544 F.3d at 604 (finding prejudice where "not one witness testified about the abuse that [the petitioner] suffered as a way of life" (internal quotation marks omitted)); *cf. Broom*, 441 F.3d at 410 n.27 (holding habeas relief was not warranted when the additional mitigation evidence included "the fact that [Defendant] was placed in a juvenile detention facility as a teenager, that a close friend of [Defendant's] was shot and killed, and that [Defendant's] father was a pimp.").[2]

---

[2]The Supreme Court of Ohio's description of the background evidence that was presented in mitigation further reveals the extent to which salient details about Tibbetts's abuse simply were not disclosed during the penalty phase. The entirety of the Supreme Court of Ohio's description is as follows:

The defense presented evidence about Tibbetts's background, which offers

Even assuming, however, that the majority is correct that sufficient details about Tibbetts's abuse were introduced via Dr. Weaver's testimony, I remain unconvinced that Tibbetts was not prejudiced by counsel's deficient performance and failure to call lay witnesses such as Tibbetts's sister, father, and friends. First, had Tibbetts's family and friends testified, the evidence regarding Tibbetts's childhood abuse would have come directly from individuals who experienced the same abusive environment as Tibbetts and even from one individual who actually inflicted some of the abuse. Having those individuals testify as to what Tibbetts endured certainly would have had a greater impact on the jury than just listening to Dr. Weaver mention Tibbetts's childhood abuse vaguely and in passing. Second, it is important to remember one of the State's tactics during the penalty phase was to challenge the legitimacy of the defense's mention of childhood abuse, however minimal the reference. Thus, even assuming that the testimony from the above-mentioned lay witnesses would not have uncovered evidence different in *substance* from that which was introduced—again, a proposition with which I do not agree—the evidence certainly would have been different in *strength* based on its source. Throughout the hearing, the State attempted to undermine the mitigation value of Tibbetts's abusive childhood by implying that the defense was fabricating any mention of such abuse. For example, when Dr. Weaver spoke vaguely about the problems that Tibbetts had in foster care, the prosecutor pointed out that "[t]he information [Dr. Weaver was] telling . . . the jury [wa]sn't in [the children's services records]. . . . This [information was] in a conversation [that Dr. Weaver] had with [Tibbetts's] sister at some other time which [the court and the jury] have nothing about." J.A. at 1171 (Weaver Test.). The State also noted that the records contained no information about Tibbetts's abusive childhood, *id.* at 1170, and, to the contrary, indicated that the State had monitored appropriately Tibbetts's placement in foster care, implying that any claim

---

some modest mitigating value. Dr. Weaver described Tibbetts's childhood as "miserable" and "horrible." Because Tibbetts's parents were drug users, Tibbetts and his siblings were placed in foster care at an early age. Tibbetts spent most of his childhood living in either a foster home or an orphanage. Tibbetts eventually achieved some success in high school as a member of the football team, but suffered a knee injury that ended his high school football career. At an early age, however, he began a pattern of getting into trouble with the authorities and eventually spent time in prison.

*State v. Tibbetts*, 749 N.E.2d 226, 258 (Ohio 2001).

that the placements were problematic was exaggerated, if not an outright lie, *id.* at 1172. As mentioned above, the State's claim regarding the various records was not far from the truth. Again, the records contained surprisingly little in the way of *definitive* evidence that Tibbetts was raised in a mentally and physically abusive environment, and much of the mention of abuse was couched in terms of *speculation* and *possibilities* with social workers reporting rumors of abuse but never making any determination or conclusion. Based on the evidence that counsel submitted at mitigation, then, the jury could have deliberated with the erroneous impression that Tibbetts was never actually abused as a child, which the evidence revealed in post-conviction proceedings shows is clearly not the case. In short, had counsel relied on first-hand accounts about Tibbetts's abusive home and foster-care placements, the State would have been unable to challenge so readily the little evidence of Tibbetts's abusive childhood that was conveyed.

Furthermore, I cannot turn a blind eye in the prejudice analysis to the fact that the effectiveness of the defense's sole mitigation witness, Dr. Weaver, was undermined by several of his statements characterizing Tibbetts as a dangerous individual, even when sober. When trial counsel asked Dr. Weaver whether Tibbetts had the ability to control himself and his impulses, Dr. Weaver stated:

> When I saw him the first time, I guess that I got a little concerned about my own safety. . . . When I saw him initially, and when he came in, the air when I had—when I looked at him, you know, I'm not going to cross him. I'm not going to cross him. This was even in the Justice Center in the medical department there. . . . It was more of a—more of an open-ended interview which I had with him for the most part, about things. I didn't push him. I'm concerned about my own safety.

J.A. at 1139 (Weaver Test.). These statements not only cast Tibbetts in an extraordinary negative light, but they also weaken the legitimacy of the mitigation theory on which the defense relied—that drugs and alcohol precluded Tibbetts from being able to appreciate his criminal acts or control himself. After all, the *only* witness who had been called to make the case to spare Tibbetts's life was, in reality, concerned about Tibbetts's inability to control himself even when lucid, sober, and incarcerated, thus implying that it might

not have been the drugs and alcohol that induced the crime. Dr. Weaver's statements did not escape the prosecutor, who emphasized them on cross examination:

> Q:     You were apprehensive of this man at that time when you walked in to sit down to see him.
> A:     Sort of bad vibes that I had when he walked in the room, yes sir.

J.A. at 1162 (Weaver Test.).

In short, the evidence that counsel failed to uncover and introduce through Tibbetts's family members and friends differs in both substance and strength from that introduced via Dr. Weaver, Tibbetts, and the official records. As in *Porter*, the jury at Tibbetts's "original sentencing heard almost nothing that would humanize" him "or allow them to accurately gauge his moral culpability." *Porter*, 130 S. Ct. at 454. And the type of mitigation evidence that trial counsel failed to uncover and introduce—that Tibbetts was abused as a child—is markedly different from the evidence that supported defense counsel's chosen mitigation theory. Evidence of childhood abuse certainly would "have elevated the jurors' sympathies for [Tibbetts]," *Bueke*, 537 F.3d at 645, in a way that evidence of his intoxication and drug abuse would not. As a panel of this Circuit stated in *Wiles v. Bagley*, "it is hardly self-evident that getting high on barbiturates before stabbing someone to death is the kind of evidence that makes a capital defendant look better in the eyes of a court as opposed to making him look even worse." *Wiles*, 561 F.3d at 640 (internal quotation marks and alteration omitted). But it is impossible to conclude that evidence of his mistreatment as a child would not have provided a compelling reason to find Tibbetts less morally culpable and spare him a death sentence. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Williams*, 529 U.S. at 398.

As a final response to the majority's claim that counsel was not constitutionally deficient and that Tibbetts was not prejudiced, I emphasize that the Supreme Court recently made clear that it has "never limited the prejudice inquiry under *Strickland* to cases in which there was only little or no mitigation evidence presented." *Sears v.*

*Upton*, 130 S. Ct. 3259, 3266 (2010).   Instead, the Court noted that it has found "deficiency *and* prejudice" in cases such as the instant case, where "counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase," *id.* (citing *Williams*, 529 U.S. at 398; *Rompilla v. Beard*, 545 U.S. 374, 378 (2005), and *Porter*, 130 S. Ct. at 449), but failed to uncover and present compelling mitigation evidence related to another, legitimate and consistent theory,**[3]** *cf. Wong*, 130 S. Ct. at 385 ("[Counsel] understood the gravity of [the] aggravating evidence [of guilt], and he built his mitigation strategy around the overriding need to exclude it.").   Indeed, the case that the majority selects to demonstrate lack of prejudice, *Phillips v. Bradshaw*, 607 F.3d 199 (6th Cir. 2010), is inapposite because in *Phillips* the additional mitigation evidence conflicted with counsel's mitigation strategy.   In *Phillips*, "['t]he majority of the additional evidence [would have] contradict[ed] the theory that [the defendant's] counsel presented during the mitigation phase," and "a different approach [to mitigation] would have been required if the totality of the mitigating evidence [had been] presented."   *Id.* at 217.   Here, as shown above and in contrast to *Phillips*, the additional evidence of first-hand accounts of Tibbetts's childhood abuse would have provided compelling reason for the jury to conclude differently at the penalty phase.

---

**[3]**The State's reliance on *Brooks v. Bagley*, 513 F.3d 618, 626 (6th Cir. 2008), and *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007), is unconvincing.   In *Brooks*, a panel of this Circuit held that the petitioner was not prejudiced by counsel's actions, even assuming deficient performance, because the information contained within the post-conviction affidavits was either presented verbatim at trial, *Brooks*, 513 F.3d at 625–26, 629, or not of the type that would have helped, *id.* at 627 (indicating the additional information consisted solely of Defendant's "belief in voodoo," the "accusation that [Defendant's wife] was having an incestuous relationship with the couple's oldest son," and the Defendant's "refusal to allow his oldest son to display athletic trophies").   As outlined above, however, that is not the case here.   Furthermore, unlike the instant case, the trial record in *Brooks* directly contradicted many of the claims in the post-conviction affidavits, *id.* at 626–27, 628, and many affidavits failed to state what information the affiants would have provided had they been contacted before the trial, *id.* at 630.

*Nields* is likewise distinguishable.   In *Nields*, a panel of this Circuit first determined that counsel was not deficient, *Nields*, 482 F.3d at 453, and then concluded that the undiscovered additional mitigating evidence was "relatively weak" regardless, *id.* at 454.   That additional evidence in *Nields* would have revealed that the petitioner's "'childhood home life was chaotic and neglectful,' that 'he was an expert and dedicated musician whose life was once very focused,' that 'he had several successful employment experiences and was a hard worker,' that 'he did not drink while he was working,' and that he 'was a dependable, kind-hearted friend and an extremely helpful, friendly person.'"   *Id.* (quoting defendant's brief).   The type of undiscovered additional evidence in Tibbetts's case is of a different character.   It does not show simply that Tibbetts could be a good guy.   It details his very traumatic, even tortured, childhood and upbringing.

**C. Counsel Was Constitutionally Ineffective**

The constitutional infirmities that plagued the penalty phase of Tibbetts's capital trial are unfortunately frequent. Yet again in this Circuit, however, a majority of a panel casts aside obvious and prejudicial errors by upholding a death sentence issued by a jury that was not informed of key mitigation evidence that could have made a difference in whether the jury decided that Tibbetts should die for his admittedly horrible crime. For the reasons discussed above, I believe that Tibbetts has shown that his trial counsel was constitutionally ineffective during Tibbetts's penalty phase. Counsel was clearly deficient in his investigation of mitigating evidence. Although he hired a mitigation specialist and requested several records from a variety of educational and medical institutions, counsel failed to follow up on the specialists' leads and explain the relevance of the introduced documents. Moreover, counsel called only one mitigation witness, who was not properly equipped to discuss Tibbetts's childhood. Most disturbingly, however, counsel failed to interview Tibbetts's family and friends, despite their willingness to provide information. Counsel's performance was constitutionally deficient.

In addition, counsel's failure to uncover significant details about the abuse that Tibbetts suffered as a child was prejudicial. The information uncovered in post-conviction proceedings "paint[ed] a significantly more detailed picture of [Tibbetts's] troubled background" than the scant evidence introduced at the penalty phase, *Jells*, 538 F.3d at 499. The nonintroduced evidence provided numerous details of Tibbetts's abuse while in foster care and disclosed, for the first time, Tibbetts's abuse while under the care of his biological parents. In addition to providing additional substance, had counsel uncovered and presented the evidence disclosed during post-conviction proceedings, the jury would have heard the horrors of Tibbetts's upbringing from first-hand sources, and Tibbetts would have been able to stymie the State's attack on the truthfulness of Tibbetts's claims that he was abused. Presented with such evidence, the jury would have been provided with an alternative, much more compelling case for sparing Tibbetts's life. Because the Ohio Court of Appeals unreasonably applied clearly established law

in concluding that counsel was not constitutionally ineffective, I would **GRANT** the writ of habeas corpus on this claim.

## II.  CONCLUSION

For the reasons discussed above, I would **REVERSE** the district court's judgment and **GRANT** Tibbetts's petition for a writ of habeas corpus on the basis of his second assignment of error.  I respectfully dissent.